967 F.2d 1483
 Util. L. Rep. P 26,234, RICO Bus.Disp.Guide 8055
 M.R. TAFFET and Robert M. Fierman, on behalf of themselves
and all of the persons, corporations, municipalities, and
other entities, other than the defendants, who are similarly
situated, Plaintiffs-Appellants,
v.
The SOUTHERN CO., Southern Company Services, Inc., Alabama
Power Company and Arthur Andersen & Co.,
Defendants-Appellees.
Frederick Rodgers CARR, Carr Sales Company, O.E.M. Products,
Inc., Timothy Dunn Stokely, Clark Stokely, III and
All Others Similarly Situated,
Plaintiffs-Appellants,
v.
The SOUTHERN COMPANY, Southern Company Services, Inc.,
Georgia Power Company, and Arthur Andersen & Co.,
Defendants-Appellees.
 Nos. 90-7088, 90-8452.
 United States Court of Appeals,
Eleventh Circuit.
 July 24, 1992.
 
 Eddie Leitman, Andrew P. Campbell, S. Lynne Stephens, Leitman, Siegal, Payne & Campbell, P.C., Birmingham, Ala., Richard H. Gill, Robert D. Segall, J. Fairley McDonald, III, Copeland, Franco, Screws & Gill, P.A., Montgomery, Ala., John A. Boudet, Jerry R. Linscott, Baker & Hostetler, Orlando, Fla., Andrew M. Scherffius, Andrew M. Scherffius, P.C., A. Timothy Jones, Joseph C. Freeman, Jack N. Sibley, Freeman & Hawkins, Atlanta, Ga., Larry Moffett, Jackson Henderson Chiles, III, Daniel, Coker, Horton and Bell, P.A., Jackson, Miss., for plaintiffs-appellants in No. 90-7088.
 M. Roland Nachman, Jr., T.W. Thagard, Jr., Maury D. Smith, John P. Scott, Jr., Balch & Bingham, Montgomery, Ala., for defendant-appellee Ala. Power Co. in No. 90-7088.
 James E. Joiner, Troutman Sanders, Atlanta, Ga., for defendant-appellee Southern Co. in No. 90-7088.
 M. Robert Thornton, Michael C. Russ, King & Spaulding, Kevin C. Greene, A. William Loeffler, Ralph H. Greil, Troutman Sanders, Atlanta, Ga., for defendant-appellee Arthur Andersen & Co. in No. 90-7088.
 Joe C. Freeman, Jr., A. Timothy Jones, Jack N. Sibley, Freeman & Hawkins, Andrew M. Scherffius, Atlanta, Ga., William Byrd Warlick, Jack B. Long, Nixon, Yow, Waller & Capers, Augusta, Ga., for plaintiffs-appellants in No. 90-8452.
 Wyck A. Knox, Jr., Augusta, Ga., James E. Joiner, Michael C. Russ and M. Robert Thornton, Kevin C. Greene, A. William Loeffler, Ralph H. Greil, Troutman Sanders, Atlanta, Ga., for defendant-appellee in No. 90-8452.
 Appeal from the United States District Court for the Middle District of Alabama.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, COX, and DUBINA, Circuit Judges.*
 TJOFLAT, Chief Judge:
 These two cases,[1] consolidated on appeal, raise the question whether a private suit under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c) (1988), may be brought against a utility to recover for excessive charges for electrical power resulting from the utility's fraudulent and material misrepresentations to a state rate-setting commission. The appellants in these cases seek to represent those who have purchased electrical power from Georgia Power Company and Alabama Power Company (the Utilities), both of which are subsidiaries of The Southern Company. The appellants allege that the Utilities, in conspiracy with Arthur Andersen & Co., their independent accounting firm, understated their net income in rate applications to their state public service commissions (the PSCs) by improperly accounting for purchases of spare parts; thus, the Utilities fraudulently obtained rate increases.[2]
 The district courts below dismissed the appellants' complaints under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Both courts, finding that the exclusive authority to set rates for electricity is vested in the PSCs, based dismissal upon the filed rate doctrine, the primary jurisdiction doctrine, the clear statement doctrine, and abstention based upon federalism interests. Taffet v. Southern Co., No. 89V-712N, 1990 U.S. Dist. LEXIS 4189, at *3-5 (M.D.Ala. Jan. 5, 1990); Carr v. Southern Co., 731 F.Supp. 1067, 1071-72 (S.D.Ga.1990). On consolidated appeal to this court, a divided panel reversed; the majority rejected each of the doctrines relied upon by the district courts as a basis for dismissal of the cases at hand. Taffet v. Southern Co., 930 F.2d 847, 851-57 (11th Cir.1991), vacated, 958 F.2d 1514 (11th Cir.1992) (per curiam). The dissent argued that the filed rate doctrine and the primary jurisdiction doctrine foreclose application of RICO to a public utility after a rate has been approved by a state rate-making body; thus, the appellants' actions must be dismissed. Id. at 857 (Birch, J., dissenting).
 
 
 1
 A majority of this court's judges in regular active service ordered that the consolidated appeals be reheard by the court en banc. Taffet v. Southern Co., 958 F.2d 1514 (11th Cir.1992) (per curiam).[3] On rehearing en banc, we affirm the district courts' dismissals of these actions.
 
 I.
 
 2
 Section 1964(c) of RICO allows a private plaintiff to recover for injuries that he has suffered to his business or property as a result of a violation of the criminal prohibitions in section 1962 of RICO.[4] Section 1962 imposes criminal liability on
 
 
 3
 those who engage in, or aid and abet another to engage in, a pattern of racketeering activity if they also do the following: invest income derived from the pattern of racketeering activity in the operation of an enterprise engaged in interstate commerce (section 1962(a)); acquire or maintain, through the pattern of racketeering activity, any interest in or control over such an enterprise (section 1962(b)); or conduct, or participate in the conduct of, the affairs of such an enterprise through a pattern of racketeering activity (section 1962(c)). Section 1962(d) makes it a crime to conspire to violate sections 1962(a), (b), or (c).
 
 
 4
 Pelletier v. Zweifel, 921 F.2d 1465, 1495-96 (11th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991). Title 18 U.S.C. section 1961(1) lists the acts that constitute "racketeering activity" under RICO.[5] A "pattern" of racketeering activity consists of at least two acts of racketeering activity committed within ten years of each other (excluding any period of imprisonment). 18 U.S.C. § 1961(5) (1988).
 
 
 5
 The RICO plaintiff, to recover, must show that the defendant is criminally liable under section 1962, Pelletier, 921 F.2d at 1496, and that the plaintiff has suffered an injury that "flow[s] from the commission of the [criminal violation]." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted).
 
 
 6
 In the instant cases, the appellants allege that they have suffered an injury to their business and property, within the purview of title 18 U.S.C. section 1964(c), in the form of excessive and illegal charges paid for electrical utility services, and that this injury is the proximate result of the appellees' racketeering activities, in violation of the prohibitions set forth in title 18 U.S.C. section 1962,[6] relating to their conspiracy and scheme to obtain PSC approval of excessive rate increases by means of fraudulently accounting for spare parts held in inventory.
 
 
 7
 The appellants' argument rests on the assumption that they enjoy a legal right to have been charged a lower rate than they actually were charged; the appellants, unless they enjoy such a right, have suffered no legally cognizable injury by having paid the higher rate. We conclude that the appellants do not possess this right; therefore, they have failed to state a claim upon which relief can be granted under RICO.
 
 A.
 
 8
 We find support for our conclusion that the appellants have not suffered a legally cognizable injury sufficient to predicate a RICO civil action in a line of Supreme Court cases that developed what has come to be known as the "filed rate doctrine." The origin of the filed rate doctrine can be traced back to Texas & Pacific Railway v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed.553 (1907), in which the Supreme Court addressed the issue of whether a shipper could maintain a common law action for damages against a common carrier for "the exaction of an alleged unreasonable rate, although the rate collected and complained of was the rate stated in the schedule filed with the Interstate Commerce Commission...." Id. at 436, 27 S.Ct. at 353. The Court held that the shipper could not maintain such an action. After acknowledging that, at common law, a shipper had a right of action for damages against a carrier who refused to carry goods except upon the payment of an unreasonable sum, id., the Court held that the Interstate Commerce Act implicitly had changed the common law, id. at 436, 27 S.Ct. at 353-54, and that the shipper's only redress was through the Interstate Commerce Commission (ICC) which had the power to alter established rates. Id. at 448, 27 S.Ct. at 358. The Court reasoned that the existence of a shipper's right to recover damages on the basis that the established rate was unreasonable was "wholly inconsistent with the administrative power conferred upon the [ICC], and with the duty, which the [Interstate Commerce Act] casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed." Id. at 440-41, 27 S.Ct. at 355.
 
 
 9
 Following Abilene Cotton, federal courts have applied the filed rate doctrine in a variety of contexts to bar recovery by those who claim injury by virtue of having paid a filed rate. See, e.g., Keogh v. Chicago & Northwestern Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (plaintiff may not recover under federal antitrust laws for asserted injury related to paying the rate approved by the ICC); H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485 (8th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992) (filed rate doctrine precludes suit under RICO to recover claimed damages relating to allegedly fraudulent rate approved by the Minnesota Public Utilities Commission). In Keogh, the Supreme Court held that a private shipper could not recover damages under the federal antitrust laws against carriers who allegedly had fixed rates in violation of those laws. As in Abilene Cotton, the rates at issue had been filed with the ICC. The Court held that the shipper's payment of the approved rates could not give rise to an injury to business or property prerequisite to recovery under the antitrust laws. Keogh, 260 U.S. at 162-63, 43 S.Ct. at 49-50. The Court reasoned:
 
 
 10
 Section 7 of the Anti-Trust Act gives a right of action to one who has been "injured in his business or property." Injury implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.
 
 
 11
 Id. at 163, 43 S.Ct. at 49 (citation omitted).
 
 
 12
 More recently, the Supreme Court reaffirmed the rule of Keogh. In Square D. Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the plaintiffs alleged that they had been forced to pay excessive rates for interstate shipping because the defendants collectively had engaged in price-fixing, in violation of the Sherman Act, pursuant to an agreement filed with the ICC. The plaintiffs sought treble damages, measured by the difference between the rates they paid and the rates that they allegedly would have paid in a freely competitive market. The Supreme Court noted that the rates at issue were "duly submitted, lawful rates under the Interstate Commerce Act," id. at 417, 106 S.Ct. at 1927, and, following the rule of Keogh, held that even if the plaintiffs' allegations of price-fixing were true, the plaintiffs could not have been injured in their business or property within the meaning of the antitrust laws by paying the rate approved by the ICC. Id. at 416-17, 423-24, 106 S.Ct. at 1926-27, 1930-31.
 
 
 13
 The seminal case applying the filed rate doctrine in the context of electric utility rates is Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The dispute in Montana-Dakota Utilities arose from a series of contracts entered into between the parties, both of whom were electric utilities companies. The contracts established rates that each paid to the other for electric power. The rates established were filed with and accepted by the Federal Power Commission which the Federal Power Act, 16 U.S.C. § 824e(a) (1988), charged with fixing reasonable electric utility rates.[7] The plaintiff alleged that the defendant's fraud in connection with the setting of these rates deprived it of its right under the Federal Power Act to have reasonable rates and charges for electric power. It sought as damages the difference between the filed rates and the rates that would have been set absent the defendant's alleged fraud. The Supreme Court affirmed the dismissal of the claim, ruling that the plaintiff had not established a cause of action under the Federal Power Act because it had no right under the Act to pay any rates other than the rates approved by the Federal Power Commission. Id. at 251-55, 71 S.Ct. at 695-97. The Court explained:
 
 
 14
 [T]he problem is whether it is open to the courts to determine what the reasonable rates during the past should have been. The petitioner, in contending that they are so empowered ... regard[s] reasonableness as a justiciable legal right rather than a criterion for administrative application in determining a lawful rate.... It is not the disembodied "reasonableness" but that standard when embodied in a rate which the Commission accepts or determines that governs the rights of buyer and seller. A court may think a different level more reasonable. But the prescription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce.
 
 
 15
 Petitioner cannot separate what Congress has joined together. It cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate....
 
 
 16
 Id. at 251, 71 S.Ct. at 695 (emphasis added).
 
 
 17
 As the cases discussed above illustrate, the filed rate doctrine recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme. To determine whether the appellants in the cases at hand have alleged a cognizable injury to their business or property within the purview of RICO, we examine the rate-making schemes in Alabama and Georgia which define the rights these appellants enjoy in regard to the rates they pay for electric power.
 
 B.
 
 18
 It is settled under both Alabama and Georgia law that a consumer does not have a property right in the utility rate he pays. See Alabama Metallurgical Corp. v. Alabama Pub. Serv. Comm'n, 441 So.2d 565, 570 (Ala.1983) ("a consumer has no property right in a given level of utility rates"); Georgia Power Co. v. Allied Chem. Corp., 233 Ga. 558, 212 S.E.2d 628, 631 (1975) ("consumer has no 'property' right in the rate he pays for utilities"). In both states, regulation of utilities and setting of utility rates is purely a legislative function. Alabama Metallurgical, 441 So.2d at 570; Georgia Power Co. v. Georgia Pub. Serv. Comm'n, 196 Ga.App. 572, 396 S.E.2d 562, 568 (1990). Thus, the only "rights" that the appellants have in relation to utility rates are those that the legislature of Alabama or Georgia provide.
 
 
 19
 Alabama and Georgia each have elaborate administrative schemes to ensure that rates for electricity are just and reasonable for the affected utilities and for the public. See Ala.Code § 37-1-1 to -157 (1975) (Supp.1991); O.C.G.A. § 46-2-1 (1982) (Supp.1991). In Alabama, the legislature has delegated the responsibility for the determination of utility rates and of what constitutes a fair rate of return to the Alabama PSC. Alabama Power Co. v. Alabama Pub. Serv. Comm'n, 422 So.2d 767, 769 (Ala.1982). Thus, the PSC has exclusive authority to set electrical power rates. Ala.Code § 37-1-31. Whenever a utility wishes to change an existing rate, it must file a new rate schedule with the PSC. Id. at § 37-1-81(a). The new rate becomes effective after thirty days or at a later date specified in the rate schedule unless the PSC disapproves the rate. Id. Further, the PSC can suspend or disapprove a rate at any time so long as it acts in accordance with procedures prescribed by the legislature. Id.
 
 
 20
 Upon written complaint by a rate-payer that an effective or proposed rate is unfair, the Alabama PSC has the duty to investigate the reasonableness of the challenged rate. Id. at § 37-1-83. If the rate-payer is dissatisfied with the PSC's disposition of his complaint, he may appeal the PSC's action directly to the Alabama Supreme Court. Id. at § 37-1-140 (Supp.1991). The role of the Alabama judiciary is to ensure that the PSC has carried out its regulatory function within constitutional limits. Alabama Metallurgical, 441 So.2d at 570. Thus, a "[c]ourt's inquiry ordinarily goes no further than to ascertain whether there is evidence to support the findings of the [PSC]." Alabama Power, 422 So.2d at 769 (quoting Alabama Gas Corp. v. Wallace, 293 Ala. 594, 308 So.2d 674, 679 (1975)). Alabama courts neither make rates nor substitute their judgment for that of the PSC. Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 427 So.2d 981, 984 (Ala.1982). Indeed, the Alabama Supreme Court has stressed that the judiciary has no authority to set utility rates. Alabama Metallurgical, 441 So.2d at 570.
 
 
 21
 The scheme for regulating utilities and setting utility rates under Georgia law is similar to the Alabama scheme discussed above. The General Assembly of Georgia has vested the Georgia PSC with "exclusive power to determine what are just and reasonable" electric power rates. O.C.G.A. § 46-2-23(a) (Supp.1991). An electric utility must file a rate schedule with the PSC at least thirty days before a new rate is scheduled to go into effect. Id. at § 46-2-25(a). The PSC, upon written complaint or upon its own initiative, may then conduct a hearing concerning the proposed rate. Id. at § 46-2-25(b).
 
 
 22
 Georgia's Assembly sought to ensure that consumers of utility services are adequately represented in proceedings affecting utility rates and services. See 1981 Ga.Laws 122. Thus, anyone with an interest in the rate-determination proceeding may file a motion to intervene in the proceeding. Id. at § 46-2-59. A person who has exhausted the administrative remedies available before the PSC and who is "aggrieved" by the PSC's rate-making decision may seek judicial review of the decision first in the Superior Court of Fulton County, and, then, in the Georgia Court of Appeals or the Georgia Supreme Court. Id. at §§ 50-13-19 to -20 (1990).[8] Georgia courts recognize, however, that "[t]he legislative function of rate-making ... is essentially a matter for the Public Service Commission, and not the judiciary." State Farm Fire & Casualty Co. v. Southern Bell Tel. & Tel. Co., 150 Ga.App. 622, 258 S.E.2d 198, 199 (1979), rev'd on other grounds, 245 Ga. 5, 262 S.E.2d 895 (1980). Accordingly, a court reviewing the reasonableness of a utility rate "shall not substitute its judgment for that of the [PSC] if there is any evidence to support its findings." Lasseter v. Georgia Pub. Serv. Comm'n, 253 Ga. 227, 319 S.E.2d 824, 829 (1984).
 
 
 23
 The rate-setting schemes in both Alabama and Georgia are incompatible with a rate-payer's cause of action to recover damages measured by the difference between the filed rate and the rate that would have been charged absent some alleged wrongdoing. Allowing consumers of the Utilities' services to recover damages for "fraudulent" rates or otherwise "erroneous" rates would disrupt greatly the states' regulatory schemes and, in the end, would cost consumers dearly. For the appellants in these cases to recover, they first would have to establish that the rates set by the PSC were in fact unreasonable. Thus, the trial judge, or a jury, would have to determine what rate should have been set by the PSC. Regardless of what the PSC has determined is a reasonable rate, a trial court would be empowered to set, in effect, a new rate.[9]
 
 
 24
 The court's damages award would have the effect of retroactively reducing the rate for electric power; the Utilities would, in essence, be forced to refund to each of their customers the amount allegedly overcharged.[10] 0] Moreover, if the "erroneous" rate were still in effect when the court determined it to be erroneous, the Utilities might be forced to adopt the court's rate or risk future liability.
 
 
 25
 Of course, it is the Utilities' present and future customers who would get stuck with the bill in the end. The Utilities' litigation costs, the awarded damages and attorneys' fees, and any revenue lost because of an erroneous court-set rate would become part of each Utility's rate base. It is likely that the PSCs would take all of this into account when setting a future rate for electricity, especially if the PSC disagreed with the district court's determination of a reasonable rate. Even if the PSCs would not allow the Utilities to recoup in a new rate all of the costs stemming from the appellants' suit, the Utilities still would recoup those costs at the expense of future customers by cutting the quality of service they provide to those customers.
 
 
 26
 There is another way in which damage awards for "erroneous" rates would undermine the states' regulatory schemes. Alabama and Georgia both have chosen to establish procedures that allow public participation in the rate-making process. Allowing plaintiffs to collect damages measured by the difference between the filed rate and the rate a court finds reasonable would encourage consumers of a utility's services to sit out the state's rate-making process and then to repair to court to play litigation lottery. There could be no end to the number of strike suits that would be brought as eager lawyers, using the class action vehicle, circumvent the states' rate-making mechanisms--all at the expense of consumers.
 
 
 27
 Rather than provide for a right to recover damages, Alabama and Georgia have structured their rate-making schemes so that the PSCs can provide a remedy for the defendants' fraud that will adequately compensate the appellants while not undermining the PSCs' authority to set reasonable rates: in both Georgia and Alabama, the PSC can set a prospective rate low in order to compensate consumers for excessive rates they paid in the past that were procured by fraud.
 
 
 28
 It is true that, under Alabama law, a PSC cannot declare retrospectively that a rate it previously approved was unreasonable and, therefore, unlawful. See Ala.Code § 37-1-97; T.R. Miller Mill Co. v. Louisville & Nashville R.R. Co., 207 Ala. 253, 92 So. 797, 801 (1921). Also, even if the PSC or a court declares that a previously approved rate was excessive, it may not order the utility to refund the excess to consumers. See, e.g., Foshee v. General Tel. Co., 295 Ala. 70, 322 So.2d 715, 717 (1975); State v. Alabama Pub. Serv. Comm'n, 293 Ala. 553, 307 So.2d 521, 539 (1975). Alabama law, however, directs the PSC to set prospective rates that are "reasonable and just to both the utility and the public." Ala.Code § 37-1-80 (Supp.1991) (emphasis added). Rate-payers, as persons affected by an excessive rate obtained by fraud, may file a complaint with the PSC, id. § 37-1-83; if the PSC, upon investigation of the complaint, determines that the rate is indeed excessive or unfair, it must set a reasonable rate--one that is fair to both public and utility--to be followed in the future, id. § 37-1-97. It would seem that a reasonable rate in a case in which the past rate was unreasonable because the utility defrauded the PSC would be low enough to ensure that consumers' future bills compensate them for the excess they paid in the past.[11]
 
 
 29
 To be sure, Alabama law entitles utilities to a fair net return. See Ala.Code § 37-180 (Supp.1990) (utilities must get "such just and reasonable rates as will enable [them] at all times to fully perform [their] duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of [their] property devoted to public service"). Moreover, rates of return "should be prospective, rather than retrospective in nature," Alabama Metallurgical, 441 So.2d at 569, and "must correspond to the actual needs of the company during the time they are in effect," Alabama Power Co., 422 So.2d at 773. See also, e.g., Alabama Gas Corp. v. Alabama Pub. Serv. Comm'n, 425 So.2d 430, 436 (Ala.1982) ("in determining the reasonableness of rates, it is necessary to consider the effect of rates in light of the utility's present situation").
 
 
 30
 Although this might suggest that the PSC could never award future low rates because of past misconduct, the Alabama Supreme Court has indicated that past misconduct--improper or dishonest management--is a relevant consideration in determining whether a rate provides a fair return to a utility. In Continental Telephone Company v. Alabama Public Service Commission, 376 So.2d 1358 (Ala.1979), overruled on other grounds by Alabama Gas Corp. v. Alabama Pub. Serv. Comm'n, 425 So.2d 430 (Ala.1982), for instance, the Alabama Supreme Court stated that "[i]mproper management may always be considered by the [PSC] in determining a fair rate of return." Id. at 1368. Similarly, the court has noted that "a utility is under a duty ... to manage its business honestly, efficiently, and economically. If the company performs these functions, it is entitled to a rate of return that will be fair to it and fair to the consuming public." Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 479 So.2d 1195, 1214-15 (Ala.1985) (emphasis added); cf. Continental Tel., 427 So.2d at 988 (PSC "required to grant only those rates consistent with good management practices"); Alabama Power Co., 422 So.2d at 773 (implying that evidence "that the basic data submitted [to the PSC] by the [utility] were inaccurate or that the [utility] was guilty of inefficient or dishonest management" should be considered by the PSC in determining a reasonable rate of return on the utility's investment); Birmingham Elec. Co. v. Alabama Pub. Serv. Comm'n, 254 Ala. 140, 47 So.2d 455, 460 (1949) (standards for reasonable rate of return "presuppose[ ] efficient, economical and honest management").
 
 
 31
 Likewise, Georgia has recognized that the PSC may consider dishonest or improper management in setting the rate for a utility's services. See Georgia Power Co., 396 S.E.2d at 569 (PSC may exclude from calculation of utility's investment in public service "what might be found to be dishonest or obviously wasteful or imprudent expenditures"). While, like Alabama law, Georgia law forbids the PSC from retroactively declaring filed rates illegal or awarding reparations for excesses paid by consumers, see Georgia Pub. Serv. Comm'n v. Atlanta Gas Light Co., 205 Ga. 863, 55 S.E.2d 618, 631 (1949), as in Alabama law, nothing in Georgia law forbids the PSC from setting prospective rates that are low enough to compensate consumers for excesses paid in the past because a utility defrauded the PSC. Georgia law requires the PSC to set rates that are "just and reasonable," O.C.G.A. § 46-2-23(a), "for the utility ... for present customers of the utility ... for future customers of the utility, and ... in the entire public interest...." Georgia Power Co., 396 S.E.2d at 568 (quoting Georgia Power Co. v. Georgia Pub. Serv. Comm'n, 231 Ga. 339, 201 S.E.2d 423, 425 (1973)). Certainly, the PSCs would be acting in the public interest by taking into account the defendants' alleged fraud when setting future rates.
 
 
 32
 Given that the PSCs are equipped to take the defendants' fraud into account in setting future rates, a court's award of damages against a utility for "fraudulent rate-making" would be unnecessarily disruptive to the state's scheme of utility regulation.
 
 
 33
 In sum, the legislatures of both Alabama and Georgia have provided by law that the PSCs shall establish the legal rate for a utility's services. A consumer of a utility's services has the right to participate in the rate-setting process within the parameters set up by the legislature. The consumer, however, has no legal right to pay any rate other than the one established by the PSC.
 
 
 34
 The appellants in the instant cases paid utility rates established by the PSCs. They had no legal right to pay any other rate. Since "[i]njury implies violation of a legal right," Keogh, 260 U.S. at 163, 43 S.Ct. at 49, the appellants suffered no legally cognizable injury by virtue of paying the filed rate. Thus, the appellants have failed to state a claim upon which relief can be granted under RICO.
 
 C.
 
 35
 The appellants raise two issues regarding the application of the filed rate doctrine to the cases at hand that merit some discussion. First, the appellants submit that the filed rate doctrine is a federal doctrine that applies only to rates approved by federal regulatory agencies. They contend that the filed rate doctrine and the principles underlying it are, therefore, wholly inapposite to the instant cases since the rates in question in these cases were approved by state, not federal, regulatory authorities. We disagree.
 
 
 36
 Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer "can claim no rate as a legal right that is other than the filed rate...." Montana-Dakota Util., 341 U.S. at 251, 71 S.Ct. at 695. This principle, which is central to the filed rate doctrine and to our decision today, applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one. See H.J. Inc., 954 F.2d at 494 ("the filed rate doctrine applies whether the rate in question is approved by a federal or state agency").[12]
 
 
 37
 The appellants contend also that the filed rate doctrine should not apply where a regulated entity allegedly has defrauded an administrative agency to obtain approval of a filed rate. Again, we disagree. A regulated entity's alleged fraud does not create a right to a reasonable rate that exists independently of agency action. Thus, even if the filed rate is obtained through fraud, it remains true that one does not suffer the predicate "injury to business or property" by paying the filed rate. Cf. H.J. Inc., 954 F.2d at 489 ("the impact [a civil action] will have on agency procedures and rate determinations," rather than the defendant's underlying conduct, controls whether the filed rate doctrine applies).[13]
 
 II.
 
 38
 Based on the foregoing, we AFFIRM the district courts' dismissals of the appellants' claims.
 
 
 39
 IT IS SO ORDERED.
 
 
 
 *
 Judges Anderson, Edmondson, and Birch recused themselves and did not participate in this decision
 
 
 [1]
 Frederick Rodgers Carr, Carr Sales Company, and O.E.M. Products, on behalf of themselves and all similarly situated persons, corporations, and other entities, filed the first of these actions, No. 90-8452, on June 30, 1989 in the United States District Court for the Southern District of Georgia. M.R. Taffet and Robert M. Fierman, on behalf of themselves and all similarly situated persons, filed the second of these actions, No. 90-7088, on July 10, 1989 in the United States District Court for the Middle District of Alabama
 
 
 [2]
 The appellants' allegations are recounted in detail in Taffet v. Southern Co., 930 F.2d 847, 849-50 (11th Cir.1991), vacated, 958 F.2d 1514 (11th Cir.1992) (per curiam)
 
 
 [3]
 That order vacated the panel's opinion
 
 
 [4]
 18 U.S.C. § 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. s] 1962 ... shall recover threefold the damages he sustains...." 18 U.S.C. § 1964(c) (1988)
 
 
 [5]
 18 U.S.C. § 1961(1) provides:
 (1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), sections 2251-2252 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States, or (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act.
 18 U.S.C. § 1961(1) (1988 & Supp. II 1990). As we note infra, see note 6 and accompanying text, the appellants allege that the appellees committed the following acts of racketeering activity: mail fraud under 18 U.S.C. § 1341 (1988 & Supp. II 1990), wire fraud under 18 U.S.C. § 1343 (1988 & Supp. II 1990), and transportation in aid of racketeering activities under 18 U.S.C. § 1952 (1988 & Supp. II 1990).
 
 
 [6]
 The appellants in No. 90-7088 (the Taffet appellants) allege in their complaint that The Southern Company, Southern Company Services, Inc., Alabama Power Company, and Arthur Andersen & Co. (collectively the Taffet appellees) committed or conspired in and aided the commission of numerous predicate acts involving the racketeering activity of mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343 including the following: (a) the mailing of Alabama Power Company's rate applications that included fraudulent accounting for inventory spare parts; (b) the mailing of Alabama Power Company's quarterly reports that included fraudulent accounting for inventory spare parts; (c) the mailing to Alabama Power Company's customers of millions of monthly billing statements that included fraudulent rate charges derived from fraudulent accounting for inventory spare parts; (d) the mailing of Form 3115 (regarding a proposed change in accounting, for tax purposes, of spare parts) to the Internal Revenue Service (IRS) in an effort to deceive the IRS; (e) the participation in the preparation of false rate applications that the Taffet appellees knew would be mailed to the Alabama PSC, which materials were predicated in part on fraudulent accounting for inventory spare parts; (f) the participation in the preparation of false annual, quarterly, and monthly reports that the Taffet appellees knew would be mailed to the Alabama PSC, which reports were predicated in part on fraudulent accounting for inventory spare parts; (g) the preparation and mailing by Arthur Andersen & Co. to The Southern Company, Southern Company Services, Inc., and Alabama Power Company on numerous occasions of fraudulent accounting information relating to or constituting fraudulent rate applications, financial statements, reports, audits, federal tax returns, and cost of service data, which materials were predicated in part on fraudulent accounting for inventory spare parts; and (h) the participation in hundreds of telephone calls between the Taffet appellees and other co-conspirators and between the Taffet appellees and the Alabama PSC for the purpose of perpetuating the scheme and conspiracy relating to the inventory spare parts
 The Taffet appellants allege that the Taffet appellees' misconduct is a violation of 18 U.S.C. § 1962(c) in that they have been associated with an enterprise engaged in interstate commerce, and the activities of the enterprise have affected interstate commerce, and, further, that they have conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity. Moreover, the Taffet appellants allege, the Taffet appellees have violated 18 U.S.C. § 1962(d) by conspiring among themselves and with others to violate 18 U.S.C. § 1962(c).
 The appellants in No. 90-8452 (the Carr appellants) allege in their complaint that The Southern Company, Southern Company Services, Inc., Georgia Power Company, and Arthur Andersen & Co. (collectively the Carr appellees) have violated 18 U.S.C. §§ 1962(a), (b), and/or (c) by engaging in prohibited racketeering activities, including, but not limited to, using income derived from the rate-payers through a scheme of racketeering activity, maintaining an interest in or control of an enterprise engaged in or affecting interstate commerce through a pattern of racketeering activity, and conducting the enterprise's affairs through a pattern of racketeering activity. The Carr appellants further allege that the Carr appellees violated 18 U.S.C. § 1962(d) by conspiring between themselves and with others to violate §§ 1962(a), (b), and (c).
 The specific acts of racketeering alleged by the Carr appellants, which they contend constitute mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and violations of 18 U.S.C. § 1952 (transportation in aid of racketeering enterprises), include the following: (a) the mailing of Georgia Power Company's periodic filings and submissions that included fraudulent accounting for maintenance spare parts; (b) the mailing to Georgia Power Company's customers of millions of monthly billing statements that included fraudulent rate charges, overcharges, and increases to rate-payers derived from the Carr appellees' fraudulent accounting for maintenance spare parts; (c) the mailing of Georgia Power Company's Forms 3115 to the IRS to defraud the IRS; (d) the participation in the preparation of false filings and submissions to the Georgia PSC, the Federal Energy Regulatory Commission, and the Securities and Exchange Commission and in the preparation of financial statements, reports, audits, and cost of service data that the Carr appellees knew or reasonably should have anticipated would be mailed to the Georgia PSC, among others, which materials were predicated in part on fraudulent accounting for maintenance spare parts; (e) the participation in the preparation, mailing, and telephonic discussion by the Georgia Power Company's audit committee of annual examinations of the affairs of the company, which examinations were predicated in part on fraudulent accounting for maintenance spare parts; (f) the participation in the preparation of false annual reports that the Carr appellees knew or reasonably should have anticipated would be mailed to the PSC, which reports were predicated in part on fraudulent accounting for maintenance spare parts; (g) the preparation and mailing by Arthur Andersen & Co. to The Southern Company, Southern Company Services, Inc., and Georgia Power Company on numerous occasions of fraudulent accounting information relating to or constituting fraudulent filings and submissions, financial statements, reports, audits, federal tax returns, and cost of service data that the Carr appellees knew or reasonably should have anticipated would be mailed to the Georgia PSC, among others, which materials were predicated in part on fraudulent accounting for maintenance spare parts; (h) the participation in numerous telephone calls between the Carr appellees and other co-conspirators and between the Carr appellees and the Georgia PSC for the purpose of creating and perpetuating the scheme and conspiracy relating to the maintenance spare parts; and (i) the use of facilities in interstate commerce to promote the Carr appellees' unlawful activities.
 
 
 [7]
 Congress has terminated the Federal Power Commission and has transferred its powers to the Secretary of Energy and the Federal Energy Regulatory Commission. 42 U.S.C. §§ 7151(b), 7172(a), 7291, 7293 (1988)
 
 
 [8]
 Section 50-13-20 of the Official Code of Georgia provides: "An aggrieved party may obtain a review of any final judgment of the superior court under [the Georgia Administrative Procedure Act] by the Court of Appeals or the Supreme Court, as provided by law." O.C.G.A. § 50-13-20 (1990)
 
 
 [9]
 A trial court's judgment awarding damages in such a case would not directly set a new rate; in effect, however, the judgment would do so indirectly--in the form of money damages--as the ensuing discussion demonstrates
 
 
 [10]
 As we have noted, see supra note 4, a successful plaintiff under RICO recovers his damages threefold. See 18 U.S.C. § 1964(c). Thus, if the appellants in the cases at hand were successful in prosecuting their RICO claims, the Utilities would be forced to refund three times the amount allegedly overcharged
 
 
 [11]
 This is consistent with the rule that the PSC may not order the utility to make direct restitutions to consumers. The utility's administrative costs involved in making such restitutions--calculating how much has been paid to each past consumer, locating that consumer, and sending exact payment--would be huge in comparison to the payments. If the utility were allowed to include those expenses in its rate base for future rate setting proceedings, consumers might end up paying more (in future, higher rates) than they gained through the restitutions. Alternatively, if the utility were barred from including those expenses in its rate base, it most likely would recoup its administrative costs by reducing the quality of service to consumers. If the PSC, however, calculated the utility's gain from its fraud and dropped future consumers' rates across the board to reflect that illegal gain, the utility's administrative costs would be minimal. Of course, this method of making consumers whole would not be as exact as direct restitutions, but it would adequately compensate them without the problem we have outlined above
 
 
 [12]
 Moreover, the filed rate doctrine principles that the Supreme Court explicated in the context of adjudicating claims under the federal antitrust laws apply as readily in the context of a RICO adjudication. Congress modeled the civil remedy provision of RICO, 18 U.S.C. § 1964(c), after section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1988 & Supp. II 1990), Holmes v. Securities Investor Protection Corp., --- U.S. ----, ----, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 489 n. 8, 105 S.Ct. 3275, 3281 n. 8, 87 L.Ed.2d 346 (1985), the provision pursuant to which the plaintiffs in Keogh and Square D sought to obtain trebled damages. Indeed, both statutes confer standing to bring a private civil action in the exact same language: only upon a person "injured in his business or property...."
 Congress passed RICO in 1970, 48 years after the Supreme Court held in Keogh that one is not "injured in his business or property" when one pays the rate set by an agency with rate-making authority. We presume that Congress, when it conferred standing under RICO to one "injured in his business or property," intended that this language conferring standing would be interpreted just as § 4 of the Clayton Act had been. As the Supreme Court stated recently: "We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them." Holmes, --- U.S. at ----, 112 S.Ct. at 1317-18 (citations omitted).
 
 
 [13]
 The appellees argue that the district courts' dismissals of these cases should be affirmed on the basis of Burford abstention, the primary jurisdiction doctrine, and the clear statement doctrine. In light of our holding that the appellants have not suffered an injury cognizable under RICO, we do not address these arguments