**WEGOLAND, LTD., et al., Plaintiffs,**

v.

**NYNEX CORP., et al., Defendants.**

**Donna R. ROAZEN, individually and on Behalf of all others similarly situated, Plaintiff,**

v.

**NYNEX CORP., et al., Defendants.**

Nos. 90 Civ. 496(KMW),
90 Civ. 1914(KMW).

United States District Court,
S.D. New York.

Nov. 13, 1992.

Kenneth Jacobsen, Greenfield & Chimicles, New York City, for plaintiffs.

Guy Miller Struve, Davis, Polk & Wardwell, New York City, for defendants.

## OPINION

KIMBA M. WOOD, District Judge.

Defendants move to dismiss the substantially identical complaints in these two actions. Chief Magistrate Judge Nina Gershon issued a Report and Recommendation ("Report") recommending dismissal of four of plaintiffs' seven claims; plaintiffs did not object to that recommendation. This Opinion addresses whether the court should also grant defendants' motions to dismiss the remaining three claims of the complaints. For the reasons stated below, defendants' motions are granted, and the remaining three claims in each complaint are dismissed.

## BACKGROUND

These putative class actions name as defendants NYNEX, New York Telephone Co. ("NYTel"), New England Telephone and Telegraph Co. ("NETel"), several subsidiaries of NYNEX, and several individuals who occupy executive or directorial positions within these corporate entities. Plaintiffs allege that NYNEX and its subsidiaries have conspired to defraud, and have defrauded, the ratepayers of NYTel and NETel in violation of the Racketeering

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, New York Public Service Law, §§ 91, 93, New York General Business Law, § 349, and the New York common law of fraud and negligent misrepresentation.

The Report recounts the facts alleged in detail, at 3–6; I offer only a brief sketch here. The complaints allege that NYTel and NETel gave regulatory agencies and consumers misleading financial information to support the inflated rates they requested. More particularly, plaintiffs allege a scheme in which certain unregulated subsidiaries of NYNEX sold products and services to NYTel and NETel at inflated prices. NYTel and NETel then used those prices to justify inflated rates, resulting in high profits to the NYNEX corporate family, which profited by extracting higher rates from ratepayers, but did not suffer from the higher "cost" of products and services because these extra costs inured to the benefit of members of the corporate family. The net effect, the complaints allege, was that the ratepayers and the regulatory agencies were misled into believing that certain higher rates were justifiable, and the NYNEX corporate family was able to enjoy inflated profits as a result of its misrepresentations.

Before the court presently is defendants' motion to dismiss on the grounds that the complaints (1) fail to state a claim on which relief can be granted, and (2) fail to plead fraud with particularity. The Report recommended that the motion to dismiss for failure to state a claim should be granted with respect to plaintiffs' claims under 18 U.S.C. § 1962(a), the New York Public Service Law, and the New York common law of fraud and negligent misrepresentation. It recommended that the motion for dismissal of all other claims be denied. Plaintiffs did not object to the Report; defendants objected insofar as the Report recommended denying their motion.

Defendants argue that the filed rate doctrine, discussed in detail below, mandates dismissal of RICO claims based on alleged fraud upon a regulatory commission. At the time the Report was issued, the only

appellate decision that directly addressed this issue was *Taffet v. Southern Co.*, 930 F.2d 847 (11th Cir.1991) ("*Taffet I*"), which held that the filed rate doctrine did not bar RICO claims against utilities. Largely for the reasons set forth in that decision, Chief Magistrate Judge Gershon recommended that I reject defendants' argument for dismissal based on the filed rate doctrine. Subsequent to the Chief Magistrate Judge's Report, however, the Eleventh Circuit, sitting *en banc*, reversed its earlier holding, and held that the filed rate doctrine warranted dismissal. *Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir. 1992) (*en banc*) ("*Taffet II*"). Similarly, the Eighth Circuit has recently held the filed rate doctrine applicable in another closely analogous case. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485 (8th Cir.1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). For the reasons stated below, I agree with the recent decisions by the Eleventh Circuit and the Eighth Circuit, and I therefore hold that the filed rate doctrine mandates dismissal of the remaining claims in these cases.

## DISCUSSION

### I. HISTORY OF THE FILED RATE DOCTRINE

In *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), Justice Brandeis set forth what has come to be known as "the filed rate doctrine." In that case, the plaintiff alleged that the defendant carrier conspired to fix rates for transporting freight, and that this conspiracy violated the Sherman Act. The plaintiff alleged that because he was forced to pay higher rates than he would have absent the conspiracy, he suffered damages to the extent of that difference in rates. He asked the District Court to determine the amount of the damages, and to award him treble damages under the antitrust laws.

The Supreme Court held that where, as in *Keogh*, the defendant charged a rate that had been filed with and deemed reasonable by the Interstate Commerce Com-

mission, the District Court should not grant the relief sought by plaintiff, but should instead dismiss for failure to state a claim upon which relief can be granted. The court regarded the Commission's determination of the reasonableness of the rates as dispositive of whether the rates were reasonable, even though it credited, for the purposes of argument, the plaintiff's assertion that the filed rate was the product of a conspiracy to inflate prices in violation of the Sherman Act. "All the rates fixed were reasonable and non-discriminatory. That was settled by the proceedings before the Commission." *Id.* at 161, 43 S.Ct. at 49, *citing Los Angeles Switching Case,* 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319.

Justice Brandeis pointed to several considerations in rejecting the *Keogh* complaint. First, he noted that the Act to Regulate Commerce provided a remedy for injured parties, and that it was improbable that Congress intended to afford another remedy under the Sherman Act. Second, he explained that plaintiff's legal rights were not violated by the charging of filed rates, because those filed rates determine the rights between the customer and the utility. Third, he stated that providing courts with the power to change rates retroactively would result in unequal rates being charged to members of the same class of ratepayers (lower rates for plaintiffs). Fourth, he noted that the judiciary would have to determine whether the new rate it set was reasonable and nondiscriminatory, and that such a determination would require "reconstituting the whole rate structure for many articles moving in an important section of the country." *Id.* at 164, 43 S.Ct. at 50. Finally, he remarked that the "damages alleged are purely speculative." *Id.*

Subsequent decisions have further developed the rationale for this doctrine. In *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the Supreme Court did not explicitly refer to *Keogh* or to the filed rate doctrine itself, but the Court nevertheless reiterated some of the concerns articulated in *Keogh.* The court refused to grant relief to a petitioner who alleged that its predecessor company had paid unreasonably high electric rates to the respondent. According to the petitioner, interlocking directorates between the two companies had produced contracts charging petitioner high electric rates, but the interlocking directorates prevented petitioner's predecessor from complaining about the rates to the rate-making agency. This arrangement, petitioner complained, constituted fraud.

The Supreme Court refused to grant relief, despite the possibility that there may have been fraud, and despite the fact that federal law provided the petitioner with neither an administrative remedy nor a specific cause of action under federal law to redress it. The core justification for this refusal was that plaintiff was asking the court to adjudicate what a reasonable rate would be, and the Court deemed that to be a non-justiciable issue, more appropriately determined by the Commission:

Petitioner gives its case a different cast by alleging that by fraudulent abuse of the interlocking relationship its predecessor was deprived of its independence and power to resort to its administrative remedy.

But the problem is whether it is open to the courts to determine what the reasonable rate during the past should have been. The petitioner, in contending that they are so empowered, and the District Court, in undertaking to exercise that power, both regard reasonableness as a justiciable legal right rather than a criterion for administrative application in determining a lawful rate. Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission. It is not disembodied "reasonableness," but that standard when embodied in a rate that governs the rights of buyer and seller. A court may think a different level more reasonable.

But the proscription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce.

*Id.* 341 U.S. at 250–52, 71 S.Ct. at 695.

The court offered a somewhat different rationale for the filed rate doctrine in *Arkansas Louisiana Gas Co. v. Hall ("Arkla")*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), where, quoting the Court of Appeals for the District of Columbia, the Court wrote, " 'The considerations underlying the doctrine ... are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.' " *Id.* at 577–78, 101 S.Ct. at 2930. The court's desire to preclude the theoretical possibility of discrimination appears to have driven the decision. Defendant agreed to buy gas from plaintiff at a certain rate, and agreed to a "favored nations clause," which stated that if defendant were to purchase gas at a higher rate from other companies, plaintiff would be entitled to charge defendant that higher rate. Plaintiff filed only the lower rate, but subsequently alleged that defendant had triggered the favored nations clause. On this ground, plaintiff filed an action for breach of contract, seeking to recover the higher rate. The Supreme Court held that the filed rate doctrine barred this action. The court's reason to preserve the filed rate in *Arkla* was rooted in a concern that courts not disturb the uniformity required by statute and enforced by the Commission. Because the discriminatory rate originated in a contract, the proposed damage award would have been based on a difference between the contract rate and the filed rate; *Arkla* thus did not place the court in the position of determining a reasonable rate in order to determine damages.

■ *Montana–Dakota* and *Arkla*, like *Keogh*, show that two companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that courts are not institutionally well suited to engage in retroactive rate-setting. *Montana–Dakota* and *Arkla* emphasize different aspects of the rationale of the *Keogh* case. While the *Arkla* decision focuses on the need to avoid discrimination among rate-payers, *Montana–Dakota* concentrates on the need for courts to refrain from adjudicating cases that would require them to apply the nonjusticiable standard of "the reasonable rate."

The anti-discrimination strand and the non-justiciability strand of the filed rate doctrine have each appeared in subsequent decisions of the Supreme Court and the lower courts. In a typical *discrimination* case, such as *Maislin Industries U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), the plaintiff is an individual seeking to avoid paying the filed rate, on the ground that he was quoted some lower rate. The plaintiff is able, in such a case, to identify the lower rate— in fact, usually it was the lower rate that the plaintiff paid. By contrast, in the typical *justiciability* case, the court is asked to determine a lower rate by assessing how much defendants have inflated the rate through their alleged wrongdoing. The latter was the case in *Square D Company v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), where, as in *Keogh*, plaintiffs alleged that rates had been inflated through an antitrust violation. The court held that the filed rate doctrine mandated dismissal.

■ Although *Keogh* pertained to federal regulation, *Keogh*'s rationale applies equally strongly where state law creates a state agency and statutory scheme pursuant to which the state agencies determine reasonable rates. *See, e.g., H.J.*, 954 F.2d at 494 ("we see no reason to distinguish between rates promulgated by state and federal agencies") (citation omitted); *Taffet II*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate....' " This principle, which is cen-

tral to the filed rate doctrine and to our decision today, applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one.") (citations omitted). Finally, as indicated in *Arkla,* the filed rate doctrine may apply to block state causes of action, as well as federal causes of action.

## II. WHETHER THE FILED RATE DOCTRINE APPLIES TO ALLEGATIONS OF FRAUD UPON A RATE-SETTING AGENCY

### A. Previous Decisions

The parties disagree over whether there is an exception to the filed rate doctrine in a case where the plaintiff alleges that the defendant has committed fraud upon a rate-setting agency. Both parties recognize that footnote 13 in *Arkla* states, "[W]e save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct." 453 U.S. at 583, n. 12, 101 S.Ct. at 2933, n. 12. Although plaintiffs have pointed to two decisions from the Southern District of New York that superficially support a fraud exception to the filed rate doctrine, neither of those cases involved a fraud upon a rate-setting agency.[1]

In finding an exception to the filed rate doctrine when plaintiffs allege fraud on the regulatory agency, Chief Magistrate Judge Gershon relied heavily on the Eleventh Circuit's opinion in *Taffet I,* which has now been reversed. The *Taffet* plaintiffs alleged that the utilities understated their net income in their agency filings, by improperly accounting for purchases of spare parts. The *Taffet I* analysis began with the premise that the filed rate doctrine aimed at preventing price discrimination and preserving agency authority to make rates. It then reasoned that "[t]he possibility of a RICO action against a utility which defrauds its state PSC creates great incentive for that utility to present its PSC with accurate and truthful information upon which the PSC may base its rate decisions." *Id.* at 856. The court concluded that the authority of the agency and the purpose of the filed rate doctrine would therefore be best served by permitting an exception for cases of fraud on the agency.

After its recent rehearing of *Taffet,* however, the Eleventh Circuit reversed itself and forcefully endorsed the filed rate doctrine. It concluded that permitting dissatisfied rate-payers to seek treble damages

---

**1.** *See Nordlicht v. New York Telephone Co.,* 617 F.Supp. 220, 227–28 (S.D.N.Y.1985), *aff'd,* 799 F.2d 859 (2d Cir.1986), *cert. denied,* 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987), in which the district court stated that "[t]he filed tariff doctrine ... is of no help to a defendant which fraudulently induces a plaintiff to pay a filed rate or which otherwise exacts payment by fraud." The district court went on, however, to dismiss the complaint as inadequately pled, and the Second Circuit affirmed the dismissal without mentioning the filed rate doctrine. Moreover, as the Eighth Circuit pointed out in *H.J.,* even the *dictum* of the district court opinion in *Nordlicht* does not support an exception to the filed rate doctrine for allegations that rates have been fraudulently inflated. Rather, the *Nordlicht* plaintiffs alleged that the plaintiff had been fraudulently informed that he would be charged a Canadian rate and then was wrongfully charged an American rate. The filed rate doctrine is arguably inapplicable in cases like *Nordlicht* because in those cases courts are not asked to determine what a reasonable rate would have been.

In the second case cited by plaintiffs, Judge Leval declined to extend the filed rate doctrine

to suits brought by competitors (rather than by rate-payers). *Capital Freight Services, Inc. v. Trailer Marine Transport Corp.,* 704 F.Supp. 1190, 1192–97 (S.D.N.Y.1988). The question in *Capital Freight Services* was whether defendants may benefit from the filed rate doctrine when a competitor charges them with conspiring to set rates at levels that would drive the plaintiff out of business. The district court answered no; the filed rate doctrine, Judge Leval decided, was applicable to actions by rate-payers against regulated entities, but not to actions by regulated entities against one another.

I note that *Capital Freight Services* regarded the filed rate doctrine as a narrow and limited doctrine, and viewed the Supreme Court's reaffirmation of the filed rate doctrine in *Square D.* as "simply an unwillingness to deliver a coup de grace to a weak and forcefully criticized doctrine because that function might be more appropriately carried out by Congress." *Id.* at 1195. In light of the Supreme Court's 1990 decision in *Maislin,* which expanded the doctrine to invalidate a forcefully and deliberately presented ICC policy, the Supreme Court's embrace of the filed rate doctrine can no longer be viewed as so tepid.

under RICO would reduce the rate-making authority of agencies and raise costs to consumers in the long run, by adding litigation costs, treble damages, and the cost of strike suits to the utilities' other costs.[2] It therefore decided that, even if the preservation of rate-making authority provided the filed rate doctrine's only rationale, the doctrine should apply in cases alleging fraud and RICO violations on regulatory agencies.

Additionally, the Eleventh Circuit in *Taffet II* held that "the filed rate doctrine recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by the scheme." 967 F.2d at 1490. It therefore concluded that "[a] regulated entity's alleged fraud does not create a right to a reasonable rate that exists independently of agency action." *Id.* at 1494–95. Following the justiciability rationale highlighted in *Montana–Dakota,* the court held that the filed rate doctrine applied because there is no standard against which plaintiffs' rights to reasonable rates could be measured, independently of the agency's determination. The fact that plaintiffs allege fraud does not alleviate this fundamental reason for applying the filed rate doctrine.

The Eighth Circuit in *H.J.* was equally forceful in its application of the filed rate doctrine, and it, too, found no exception to the filed rate doctrine for fraud on a regulatory agency. It held that "the underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *H.J.*, 954 F.2d at 489.

*H.J.*, like the cases at bar, involved allegations that telephone companies violated

RICO by committing fraud that led to higher rates and therefore damaged the class-member rate-payers. Although *H.J.* involved alleged bribery of members of the regulatory commission, that distinction renders *H.J.*, if anything, a stronger case for finding an exception to the filed rate doctrine than this case, yet the Eighth Circuit held that the filed rate doctrine required dismissal of the complaint.

**B. This Court's View on the Fraud Exception**

 I reach the same decision as the Eleventh and Eighth Circuits and hold that there is no general exception to the filed rate doctrine for fraud upon a regulatory agency. I reach this result for two reasons: first, I find that it would be anomalous to create a general exception to the filed rate doctrine for fraud upon a regulatory agency, in the face of the Supreme Court's application of the doctrine in *Keogh* and *Square D,* where the defendants' alleged misconduct included, or was quite similar to, fraud. Second, I agree with the Eleventh Circuit and Eighth Circuit that the goal of preserving agency authority does not justify creating a general fraud exception for the filed rate doctrine.

*1. The Anomaly of a Fraud Exception*

First, the Supreme Court in *Square D* applied the filed rate doctrine where the defendants' alleged conduct was, in essence, a form of fraud. There, plaintiffs alleged that the utilities conspired with one another to fix rates at an inflated level, submitted their rates as "reasonable" rates, and failed to disclose to the commissioners that the rates were reached as the result of a conspiracy (*i.e.,* the violations were fraudulently concealed from the commission).[3] The complaint alleged that as a

---

2. The raising of costs to consumers may, at times, be less direct than the Eleventh Circuit's discussion suggests. Some commissions may force utility shareholders to bear the brunt of corporate damages. If such action depresses the value of the utility's stock, however, there may be an indirect detriment to the ratepayers.

3. In *Keogh,* the complaint alleged the existence of a committee among the utilities, which conspired to fix rates at an arbitrary and unreasonably high level. Although it is unclear from Justice Brandeis' opinion whether the complaint alleged that the committee's action was *secret,* a footnote in *Square D* cites an argument by petitioners in *Square D* to the effect that *Keogh* did not involve allegations of "covert" violations.

result of this undisclosed conspiracy to fix rates, the filed rates were higher than they ought to have been and rate-payers were therefore injured. The Supreme Court held that on such facts, the filed rate doctrine applies; indeed, this is the paradigmatic case for the application of the filed rate doctrine. It would be anomalous to hold that there is a general exception to the filed rate doctrine for fraud upon a regulatory agency when the filed rate doctrine was developed precisely for actions alleging a type of fraud on a regulatory agency.[4]

### 2. Preserving Agency Authority

Second, applying the filed rate doctrine will advance, not subvert, the principal rationale of the filed rate doctrine: the preservation of agency authority. I do not accept the position set forth in *Taffet I* and followed in the Report, that the need to preserve agency authority justifies a general exception to the filed rate doctrine for complaints alleging fraud upon a regulatory agency, because: (a) the argument in *Taffet I* does not accord with key Supreme Court decisions applying the filed rate doctrine; (b) it takes too narrow a view of the effect of entertaining a fraud-based action upon a regulatory agency; and (c) it takes too narrow a view of the scope of agency authority.

### a. Supreme Court Precedent

In *Square D*, the plaintiffs alleged that defendants had proposed to the commission rates that had been fixed as a result of an undisclosed conspiracy in violation of the antitrust laws. If a judicial remedy had been permitted, the Court would arguably have deterred future utilities from presenting rate-setters with "fixed" rates. The Court would thereby have helped to ensure that the authority of rate-setters was not compromised by conspiracies among the utilities. In this respect, permitting antitrust suits for conspiracies to set rates would arguably have helped to preserve the authority of the rate-makers in the same way that permitting a cause of action was thought to do by the *Taffet I* court. Yet, as mentioned earlier, *Square D* is a prime example of where the filed rate doctrine *does* apply. Thus, the fact that permitting a cause of action would arguably provide an incentive for truthfulness in the rate-making process is not sufficient to refrain from applying the filed rate doctrine.

### b. Effects on Agency Authority

The analysis in *Taffet I* overlooks the fact that, even if agency authority might in some respect be benefitted by the truth-promoting effect of permitting an independent cause of action, that effect is at best indirect. The direct effect of retaining the

*Square D*, 476 U.S. at 417, n. 19, 106 S.Ct. at 1927, n. 19.

**4.** I note that the court in *Square D* did not highlight the fact that there was apparently more of a fraud on the commission in *Square D* than there was in *Keogh* (because of the fraudulent concealment of the antitrust violation in *Square D* ), and it did not choose to state explicitly that the filed rate doctrine applies even where there has been a fraud on the commission. Given that the court stated in *Arkla* "[W]e save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct," the question arises whether the court in *Square D* realized that it appeared to be deciding, without discussion, the question it declined to answer in *Arkla*. The context of the *Arkla* statement, however, suggests that the *Arkla* court was addressing a narrower question than whether there should be a general exception to the filed rate doctrine for fraudulent conduct. 453 U.S. at 583, n. 12, 101 S.Ct. at 2933, n. 12. The factual scenario of *Arkla* involved a contract that entitled plaintiff to raise its rates for defendant-buyer, under certain conditions. The lower courts found that those conditions had occurred, but that the plaintiff-utility had not filed higher rates. Plaintiff tried to recover the higher rate, but the Supreme Court held that the filed rate doctrine barred recovery. Plaintiff alleged that the filed rate doctrine should not apply, because defendant had deliberately and fraudulently failed to notify plaintiff that the conditions triggering the higher rate had occurred, and defendant had therefore fraudulently prevented plaintiff from filing the higher rate, to which the contract entitled it. The Supreme Court rejected this argument because the record did not support plaintiffs' factual allegations of fraud. It left open the legal question of whether a person's fraudulent failure to notify a seller of conditions triggering a contractual entitlement to a higher rate, thereby preventing the seller from filing a higher rate, estops that person from using the filed rate doctrine in an action against it for recovery of the higher rate. *Arkla* 453 U.S. at 583 & n. 13, 584, 101 S.Ct. at 2933 & n. 13, 2933.

action is that the court will itself engage in a certain amount of retroactive rate-setting. This itself is an exercise of power in an arena that has been legislatively assigned to agencies. Even if this usurpation of agency authority might enhance agency authority in the future, it is, in and of itself, a usurpation of agency authority. As the Eleventh Circuit pointed out in *Taffet II*, even though the complaint alleged fraud, it nevertheless called upon the court to determine filed rates retroactively, and that is the very activity that courts lack standards for doing. *Taffet II*, 967 F.2d at 1494. The fact that the remedy sought can be characterized as *damages for fraud* does not negate the fact that the court would be determining the reasonableness of rates. *H.J.* 954 F.2d at 494. Indeed, as both the *Taffet II* court and the *H.J.* court explained in detail, the *Taffet I* court underestimated the range of effects that would flow from permitting courts effectively to reset rates in fraud-on-the-commission cases. As the *Taffet II* court (perhaps somewhat over-enthusiastically) stated,[5] permitting courts to grant relief in such actions would add a range of costs to utilities, and ultimately add a range of costs to the consumers whom the agencies are. trying to protect. More relevantly to the question of agency authority, if federal courts entertained private actions essentially seeking damage awards for inflated rates, utilities would of necessity become responsive to *both* the standards of the federal courts—whatever they might turn out to be in this arena—and the standards of federal or state commissions. Unless one accepts the panglossian premise that the judicial standards would always conform to the standards of federal and state commissions, one must conclude that commissions would have to share their authority over rates, to some extent, with federal courts. The filed rate doctrine says precisely that courts should *not* force agencies to move over and share their authority in matters of rate-setting.

### c. *Agency Expertise*

The *Taffet I* court also failed to note that agencies themselves regard it as part of their function to assess the accuracy of the data with which they are presented. This is particularly true where the question is whether the alleged costs and expenditures of the utilities are in fact genuine expenditures, and are reasonable and appropriate. Commissions need not and do not always accept the utilities' assertions at face value; they are experts at challenging these assertions, and it is part of their function to decide what to accept and what to challenge. When a court, independently of a commission, challenges the accuracy and veracity of the utilities' representations, and grants an award to all rate-payers based on its assessment, it substantially usurps agency authority. Perhaps a possible exception to this would be a case where agency officials had been bribed, but that is not the case here; as noted above, at 1117, in the only such case known to this court, the court refused to create that exception.

## III. APPLYING THESE PRINCIPLES TO THESE CASES

In light of the considerations discussed above, I conclude that there is no general exception to the filed rate doctrine for fraud upon a regulatory commission. Although I do not rule out the possibility that there still might be some exceptions to the filed rate doctrine in cases of fraud, the cases at bar are not among them. Instead, these cases amply illustrate the reasons supporting the filed rate doctrine.

### A. Infringement on Agency Authority

■ The complaints in these cases allege that ratepayers were forced to pay higher rates because defendants fraudulently induced state and federal regulatory commissions into approving those higher rates, by reporting (and paying) higher costs than necessary, with respect to a wide range of their costs. If the court were to grant relief in these cases, it would also have to determine whether costs were higher than necessary and what the appropriate cost level would have been for each of the alleg-

---

**5.** See footnote 2, *supra*.

edly inflated areas of cost. The court would then need to determine what rates would have been reasonable given those costs, with respect to (1) interstate rates; (2) intrastate rates for Connecticut, New Hampshire, New York, Maine, Massachusetts, Rhode Island, and Vermont; (3) many categories of ratepayers; (4) for the years 1984–1990.

Performing such a role would clearly cut too far into the rate-making process. If the court were to adjudicate these actions on the merits, the United States District Court in the Southern District of New York—not the FCC and the Public Service Commissions in each of the states—would ultimately set the rates for ratepayers from 1984–1990 in New York State and New England. It is difficult to imagine a more extensive impingement on regulatory agencies. This is precisely the type of scenario that the Supreme Court cautioned against in *Keogh*, 260 U.S. at 164, 43 S.Ct. at 50, when it mandated dismissal rather than commit a court to "reconstituting the whole rate structure...."

### B. Agency Expertise and Authority to Assess Reasonableness

As mentioned earlier, part of agency authority is the ability to challenge the veracity of the data presented and the ability to assess the reasonableness of costs reported by the entities. In the cases at bar, plaintiffs allege that defendants incurred unreasonably high costs, which they reported as reasonable costs, because they bought from their affiliate. Regulatory bodies possess the expertise to determine whether or not certain costs are reasonable; indeed, they have done so and are continuing to do so with respect to many of the disputed matters raised in these cases. There is no particular reason to believe that courts would be better than agencies at ferreting out the misrepresentations of the defendants; on the contrary, agencies are far better suited to this task, and the filed rate doctrine suggests that courts should respect the authority of the agencies to do so.

### C. Avenues of Administrative Relief

■ Plaintiffs urge the court not to apply the filed rate doctrine because, they assert, they have no adequate administrative relief. I reject this argument for two reasons. First, the availability of adequate administrative relief has never been a prerequisite to applying the filed rate doctrine. Second, in these cases, there are strong indications that administrative avenues have been used and are being used to provide relief for ratepayers.

In several of the key decisions discussed above, there was no showing whatsoever that alternative relief would be adequate. *See, e.g., Arkla*, 453 U.S. at 584, 101 S.Ct. at 2933–34; *Square D*, 476 U.S. at 417–24, 106 S.Ct. at 1927–30. Plaintiffs correctly point out that the *H.J.* court cited the possibility of administrative relief in *H.J.*, 954 F.2d at 491. However, the Eighth Circuit's analysis did not rely on that premise. Indeed, a closer look at the Eighth Circuit's opinion reveals that it was attempting to retain a degree of harmony with *Taffet I*, despite holding a broad view of the rationale for the filed rate doctrine and its applicability. *H.J.*, 954 F.2d at 491, 492 (noting applicability of doctrine even where alleged violations would remain unredressed, emphasizing that plaintiffs' request is barred by filed rate doctrine because it would require judicial rate-making). Ironically, the Eleventh Circuit, after *H.J.* was issued, turned around in *Taffet II* and followed the Eighth Circuit in adopting a sweeping application of the filed rate doctrine. Indeed, the Eleventh Circuit applied the doctrine even though it recognized explicitly that the state administrative procedures in place did not provide for the sort of retrospective relief that the plaintiffs were seeking. *Taffet II*, 967 F.2d at 1492 ("It is true that, under Alabama law, a PSC cannot declare retrospectively that a rate it previously approved was unreasonable, and therefore, unlawful. Also, even if the PSC or a court declares that a previously approved rate was excessive, it may not refund the excess to consumers.") (citations omitted).

A brief review of administrative proceedings related to the cases at bar illustrates

the specialized institutional function that underlies the filed rate doctrine's rationale. Proceedings in many different fora have occurred and are occurring. The FCC filed an order to show cause against NYNEX in connection with its alleged overcharges, and NYNEX entered into a consent decree with the FCC involving a reduction of interstate rates that is equivalent to approximately $35.5 million. On the intrastate side, state regulators in Massachusetts and Vermont have required NETel to make excess profit adjustments. State regulators in Maine, New Hampshire, Rhode Island and Connecticut, have decided to address the problem of possible overcharges by accepting NETel's offer of voluntary excess profit adjustments.

The New York State Public Service Commission has conducted and is conducting an extensive investigation of the overcharging problems raised in the complaint. On March 7, 1991, it issued an Opinion stating that $32 million per year of NYTel's revenues should be set aside as a possible refund pending the outcome of proceedings regarding affiliate overcharging. Opinion No. 91-4 at 42. With respect to prior overcharges, it has ordered a retrospective audit of NYTel and its affiliates. The Auditor's Report is scheduled to be complete by the end of January, 1993. Although defendants state that courts historically have considered the New York commissions to be without authority to award retrospective refunds (Transcript of Oral Argument before Chief Mag. Judge Nina Gershon, March 1, 1991, at 33), it is an open question whether such authority would exist if the commission finds that NYTel committed fraud. Defendants have represented to this Court that in the event of such a finding, defendants will not "contest the Commission's reopening of any prior rate case and order of refunds." Letter of Guy Miller Struve to Hon. Kimba M. Wood, July 29, 1992, at 3.

Thus, with respect to each of the jurisdictions in which the intended class is seeking a damage award, action that appears to be

effective has been taken or is being taken by the commissions themselves.

### D. Necessity of Retroactive Rate–Setting

The Report accepted the argument that plaintiffs were not seeking a resetting of the rate, but were alleging fraud and RICO violations and seeking a damage award for those violations. In endorsing this argument, the Report cited a distinction drawn in *Taffet I:*

> [T]he essential issue in this case is not what a reasonable rate would be. Rather, the issue is whether the utilities committed fraud and violated RICO. The determination of what the rate would have been comes into play only at the point of determining damages. [citations omitted] Even at that point, the issue is not what rate would have been reasonable, but what part of the rate which the [Commission] previously deemed reasonable was the result of the utilities fraudulent acts.

930 F.2d at 854, *cited* by Report at 11. This distinction is untenable, because (at least in the cases at bar) any attempt to determine what part of the rate previously deemed reasonable was a result of the fraudulent acts would require determining what rate would have been deemed reasonable absent the fraudulent acts, and then finding the difference between the two. The point is recognized in *H.J.:*

> We are convinced that the H.J. class's RICO damages can only be measured by comparing the difference between the rates the Commission originally approved and the rates the Commission should have approved absent the conduct of which the class complains.... We reject the H.J. class's argument that the filed rate doctrine does not apply because it does not ask the court to engage in rate-making activities.

*Id.* at 494.[6]

Like the Eighth Circuit in *H.J.,* I recognize that plaintiffs are seeking an award of

---

6. We also agree with the Eighth Circuit's evaluation of the impact of *Litton Systems v. American*

*Telephone & Telegraph Co.,* 700 F.2d 785 (2nd Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct.

damages that does not explicitly ask the court to determine reasonable rates. However, like the Eighth Circuit, I believe that such an award would effectively require determining what a reasonable rate would have been. Making such a determination would not only cut too far into the function of the agencies, as forbidden by *Keogh* and its progeny; it would also require courts to impose a damage award where no justiciable standard is available.

### E. Comparison with Antitrust Conspiracies

A comparison between these cases and the antitrust cases through which the filed rate doctrine evolved further buttresses my decision to apply the filed rate doctrine here. The relevant facts in both sets of cases are similar in that they both involve an alleged conspiracy to trick regulatory bodies and reap higher rates from consumers. In the cases at bar, the alleged conspiracy is within one corporate family, while in the antitrust cases, it is among distinct corporate entities. The cases also appear to be parallel from an equitable viewpoint: although dismissal in the cases at bar appears harsh, particularly given the alleged misconduct of defendants, it is no harsher a result than in many other filed rate doctrine cases. As the Supreme Court has explained, "[d]espite the harsh effects of the filed rate doctrine, we have consistently adhered to it." *Maislin*, 497 U.S. at 128, 110 S.Ct. at 2767 (citations omitted).

Moreover, to the extent that allegations of fraud differ from those of conspiracy, they serve only to strengthen the case for deference to rate-making agencies in the face of fraud allegations. While there is no particularly good reason to believe that regulatory bodies are well suited to ferreting out secret conspiracies among competitors in violation of the antitrust laws, there *is* good reason to suppose that regulatory bodies are particularly well suited to determining whether utility costs borne within a corporate family are reasonable; indeed, one would expect commissions to be alert to this risk. Thus, the determination of whether there has been a fraudulent conspiracy to inflate costs is more closely aligned to agency function than the determination of whether there has been a fraudulent conspiracy to fix rates.

### IV. CONSISTENCY OF THIS DECISION WITH *LILCO*

Finally, I note that the application of the filed rate doctrine in these cases is both legally and theoretically consistent with the Second Circuit's opinion in *County of Suffolk v. Long Island Lighting Co. (LILCO)*, 907 F.2d 1295 (2d Cir.1990). The parties in *LILCO* did not address the filed rate doctrine, and the Second Circuit's opinion maintained complete silence on that issue, mentioning neither the doctrine nor any of the cases decided under the doctrine. Moreover, because the Second Circuit affirmed the district court's grant of j.n.o.v. in favor of the utility, *LILCO*'s result is consistent with the result in the cases at bar.

I do note, however, that although the Second Circuit eventually rejected the jury's findings of fact and therefore affirmed j.n.o.v., it did demonstrate a willingness to permit an award of damages in a RICO suit to be determined by a court, even when that award required determining what portion of a filed rate resulted

---

984, 79 L.Ed.2d 220 (1984), on a case of this sort. The Second Circuit in *Litton* held the filed rate doctrine inapplicable because the plaintiffs in *Litton* did not call upon the court, even indirectly, to determine what a reasonable rate would have been. Rather, they asked the court to determine damages based on the contention that plaintiffs should not have been required to pay any rate at all:

> This case can be distinguished from *Keogh* and decisions holding the filed rate doctrine applicable, because the issue here is not the reasonableness of the interface tariff rate as

compared to some other rate that might have been charged, but instead whether the [agency] requirement itself was reasonable, i.e., whether there should have been any charge at all.

*Id.* at 820 (citations omitted). Like the *H.J.* class, the plaintiffs here "cannot contend that there could be no charge for telephone services ..." Rather, their claim, like that of the *H.J.* class, is that due to the defendants' RICO violations, "they paid too much for telephone services." *H.J.*, 954 F.2d at 492.

from fraud. And, the Second Circuit's discussion (in *dictum*) of jurisdictional doctrines manifested a relaxed conception of the boundaries between courts and agencies, and a relatively expansive conception of federal court jurisdiction in rate-making cases. In this sense, although *LILCO* in no way forecloses the application of the filed rate doctrine in the present cases, there does appear to be some theoretical tension between *LILCO* and the applicability of the filed rate doctrine in this case.

As I indicate below, however, *LILCO* presented the Second Circuit with the possibility of an unusually benign form of intervention in the rate-making process, and the Second Circuit simply did not have occasion to consider—and did not consider—the appropriateness of judicial intervention where such intervention would have more sweeping effects on the relation between courts and regulatory bodies.[7]

The Second Circuit in *LILCO* faced a case in which LILCO had been given what the Second Circuit characterized as the "unusual" privilege of having its ratepayers effectively subsidize the building of Shoreham Nuclear Power Plant, by factoring construction costs into the rates. *LILCO*, 907 F.2d at 1300. Because there were significant concerns about the progress of Shoreham, when LILCO sought rate increases, it was asked to report on the status of the construction to the New York Public Service Commission ("PSC"). If one credits the account of the plaintiffs

in LILCO, the PSC effectively acted as fiduciaries of the ratepayers/lenders, and refused to continue the "loans" to LILCO without a reassurance that construction was proceeding apace. These reassurances were given to the PSC and as a result of the reassurances, according to plaintiffs, the rate increases were also given. The complaint in *LILCO* alleged that the reassurances were given fraudulently, and it sought as damages the loans (rate increases) that had been made contingent on these reassurances. Thus, the plaintiffs essentially alleged that the PSC had a framework of rate increases in mind, and that within that framework, a reassurance on construction status was a necessary condition of a particular rate increase.

These peculiarities of *LILCO* are relevant in three respects. First, the allegation of a simple framework linking particular increases to particular reassurances by the defendants provided the court with a way of surgically intervening in the rate determination, and impinging on the role of regulators in only a minor way. It is notable that j.n.o.v. was affirmed, in part, because the Second Circuit believed that the jury did not have sufficient evidence to conclude that the PSC's rate increases were so simply linked to the reassurances on construction status. *Id.* at 1313–20.

Plaintiffs in the cases at bar do not identify any particular state of affairs upon which a rate increase was made contingent. They do not allege a particular framework

---

7. I also note that the Second Circuit in *LILCO* decided that a factor that militated against *Burford* abstention was that the Office of the New York State Attorney General had written a letter to the district court in *LILCO* stating that " 'an award of damages in this case would enhance, rather than conflict with, New York's regulatory scheme.' " 907 F.2d at 1309. The Second Circuit held that the import of that letter was to suggest that the federal court should *"not* abstain," *id.,* and gave significant weight to that fact.

In the cases at bar, the Court has not received any such representation from any state Attorney General or from any Public Service Commission. Plaintiffs have indicated in a memorandum to this court that "[t]he New York Department of Law does not view this litigation as conflicting with New York's regulatory scheme or with its own role in the current New York

proceeding." Pl.'s Supp. Mem. of Law in Opp. to Def.'s Motion to Dismiss, July 18, 1990, at 10. However—overlooking for the purposes of argument the propriety of relying on this information, given the manner in which this information has been presented to the court—the Second Circuit did not emphasize the absence of opposition, but rather the fact that the district court had been particularly encouraged *not* to abstain in the proceedings. That is not the case here.

In any event, the Second Circuit's discussion pertained to *Burford* abstention; therefore, even if, *arguendo,* we were to treat plaintiffs' indirect representation of "no opposition" by the New State Department of Law as equivalent to the Attorney General's Letter in *LILCO,* our application of the filed rate doctrine would still be consistent with *LILCO.*

in the minds of regulators that is sufficiently specific that a fact-finder would have a standard for determining what rate would have been deemed reasonable absent the alleged fraud. They do not provide any option for surgical intervention by the courts. Rather, in innumerable different ways and for a period of six years, the cost structures of the regulated entities would have to be redetermined, and then the fact finders would have to assess what would have been (or what would have been deemed) reasonable rates.

Second, the misrepresentations alleged in *LILCO* were of a kind that courts and jurors regularly judge, and they were not of a kind for which agencies are supposed to possess any particular expertise. The plaintiffs contended that certain individuals testifying to the PSC had stated that they expected construction to be complete on a certain date, when in fact they did not expect construction to be complete on that date. The fact-finders (in this case, the jury, followed by the district court judge and the circuit court judges), insofar as they were required to determine whether fraud had occurred, were asked only whether the individuals and entities had a certain belief about the expected completion date of a construction project.

By contrast, the misrepresentations alleged in these cases are of a kind that requires fact-finding that falls within the expertise of agencies. They are not garden-variety determinations regularly made by judges and jurors. Although I do not believe that jurors and judges are incompetent to find facts as to whether the price-setting by the unregulated defendants was inflated, these determinations clearly invoke agency expertise in a way that the assessment of fraud in *LILCO* did not. To this extent, the facts of the cases at bar present this court with much stronger cases for the application of the filed rate doctrine than the facts in *LILCO* presented to the Second Circuit.

Third, *LILCO* presented itself to the Second Circuit as an unusual case in which the utility sought rate increases to serve a purpose—building a plant for the future—that was ancillary to the provision of services to the current ratepayers. In these circumstances, the court was not required to face the question of whether widespread suits of this nature would harm the relation between courts and agencies. And, as mentioned, it did not address that question.

In contrast, the complaints before this court essentially allege that the regulated entities defrauded regulatory agencies and ratepayers by fraudulently misrepresenting their costs. Because similar allegations are commonly found in suits challenging rates, it is clear here—as it was not in *LILCO*—that permitting an action would open the door to innumerable similar complaints with respect to other utilities, each effectively alleging a right to have courts award damages based, in effect, on a court-set retroactive rate readjustment.

In sum, *LILCO* does not provide a basis for rejecting application of the filed rate doctrine here. In *LILCO*, a damage award could be deduced from a framework pre-set by the commission, with only minor intrusion by the court; the fraud alleged was not of the sort that regulatory bodies are better equipped than courts to detect; and the factual allegations were sufficiently "unusual" that permitting an action did not open the floodgates to suits that would threaten, in cumulative effect, to alter the relation between courts and regulatory bodies. The cases at bar are not benign in any of these respects. Given these differences, given the facts that *LILCO* never addressed the filed rate doctrine, and that the Second Circuit ultimately affirmed j.n.o.v. for the utility, and given the vitality of the filed rate doctrine as indicated by *Maislin, H.J.,* and *Taffet II,* it would be inappropriate to view *LILCO* as a bar to the filed rate doctrine in these cases.[8]

**8.** I note that our conclusion does not conflict with *LILCO's* holding that RICO permits a cause of action for a pattern of conduct constituting a conspiracy to defraud a rate-making agency. *LILCO,* 907 F.2d at 1305–08. The statutory reference point for applying the filed rate doctrine is the statute (or statutes) empowering agencies to approve rates, not the statute(s) under which plaintiffs allege a cause of action. The decision

## V. THE STATE LAW CAUSE OF ACTION

In addition to two RICO claims, one state law cause of action survived the Magistrate Judge's Report. Given that the filed rate doctrine has been held to bar state causes of action, *Arkla,* and that plaintiffs seek essentially the same relief under the state causes of action as under RICO, the considerations above provide an adequate basis for dismissing the state causes of action under the filed rate doctrine. However, even if, *arguendo,* the filed rate doctrine should not be applied to the state causes of action in the cases at bar, I would nevertheless dismiss those actions. Once the RICO actions have been dismissed, there is no basis for subject matter jurisdiction over the state claims, other than the trace of discretionary pendent jurisdiction that remains because a federal cause of action was initially part of the complaint. Although this court might enjoy some power to retain the state claims, I would not exercise that power, in light of the strong reasons enumerated above for keeping federal courts out of this area, and in light of the overwhelming preponderance of state interests over federal interests that would remain in the case if the RICO action were dismissed.[9]

## CONCLUSION

For the reasons stated above, the complaints are dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

SO ORDERED.

that the filed rate doctrine applies is not intended as an interpretation of RICO.

Indeed, I note that it is entirely consistent with this opinion that a cause of action under RICO for fraud upon a regulatory agency would survive the filed rate doctrine. For the reasons discussed above, *LILCO* itself might have been such an example, had the filed rate doctrine been considered. To take another example, a person who, as a result of a conspiracy in violation of RICO, was required to pay a rate when she should not have been required to pay any rate at all, might be in a position to request the court's relief without running afoul of the filed rate doctrine. *Compare Litton,* 700 F.2d at 820, and discussion, *supra.* Or, for example, a competitor might file a RICO action for conspiracy to defraud a regulatory agency, again, without running afoul of the filed rate doctrine. *Compare Capital Freight Services,* 704 F.Supp. at 1192–97, and discussion, *supra.*

My conclusion is also consistent with the Second Circuit's treatment of primary jurisdiction, *LILCO,* 907 F.2d at 1309–11, and *Burford* abstention. *Id.* at 1308–09. Because I do not find it necessary to do so, I do not reach the issue of whether the Report correctly rejected defendants' primary jurisdiction and *Burford* abstention arguments in the cases at bar. Report at 8–9; (defendants' *Burford* abstention argument fails, given *LILCO* ); Report at 9–13 (defendants' primary jurisdiction argument fails, given *LILCO* ). However, I note that the Second Circuit held primary jurisdiction inapplicable because *LILCO,* unlike the cases at bar, did not include federal rate-setting. With respect to *Burford* abstention, I note that even if a court decided that federalism concerns, taken on their own, did not warrant *Burford* abstention, it might well decide that the filed rate doctrine applied. *Burford* abstention pertains to the deference owed by federal courts to state regulatory schemes, and its justification lies in federalism concerns. By contrast, the filed rate doctrine is premised on the principle that ratepayers do not have the right to have courts give them damage awards that effectively reset their (filed) rates. There is no reason to be surprised that these somewhat different doctrines, each supported by its own justification and its own line of decisions, might sometimes yield different results.

9. As indicated above, I do not find it necessary to reach the issue of whether the primary jurisdiction doctrine applies to the case at bar. I note, however, that were I to retain the state causes of action, the question would arise as to whether the primary jurisdiction doctrine should be applied to that portion of the complaint that seeks relief for interstate rates over which the FCC normally has authority. In light of the *LILCO* court's broad suggestion that the applicability of primary jurisdiction doctrine depends heavily on whether federal regulatory schemes are implicated, and in light of the fact that the FCC has, in fact, addressed the dispute at the core of this litigation, I would be inclined to find the primary jurisdiction doctrine applicable to state claims insofar as they relate to federal rate-setting. This would render the remainder of the action exclusively state-related, and would further counsel against the exercise of pendent jurisdiction.