

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-2004

# Utilimax.com Inc v. PPL Energy Plus LLC

Precedential or Non-Precedential: Precedential

Docket No. 03-3339

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Utilimax.com Inc v. PPL Energy Plus LLC" (2004). *2004 Decisions.* Paper 375.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/375

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

No. 03-3339

_____

UTILIMAX.COM, INC.,
Appellant,

vs.

PPL ENERGY PLUS, LLC; PPL
CORPORATION; ABC CORPS. 1-10;
JOHN DOES 1-10,

_____

APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF
PENNSYLVANIA

(D.C. No. 02-cv-07160)

District Judge: The Honorable
Anita B. Brody

_____

ARGUED MARCH 11, 2004

BEFORE: SLOVITER and NYGAARD,
Circuit Judges.
and SHADUR,* District Judge.

*Honorable Milton I. Shadur, Senior
District Judge for the United States
District Court for the Northern District of
Illinois, sitting by designation.

(Filed : August 9, 2004)

_____

Brian J. Fruehling, Esq. (Argued)
Fruehling & Stevens
66-68 Main Street
P. O. Box 476
Madison, NJ 07940

James K. Fruehling, Esq. (Argued)
Fruehling & Stevens
66-68 Main Street
P. O. Box 476
Madison, NJ 07940
        Counsel for Appellant

James R. Atwood, Esq. (Argued)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

John G. Harkins, Jr., Esq.
Harkins Cunningham
2005 Market Street
2800 One Commerce Square
Philadelphia, PA 19103
        Counsel for Appellees

_____

OPINION OF THE COURT
_____

NYGAARD, Circuit Judge.

In this appeal, Utilimax argues that
the District Court erred when it dismissed
its claims against PPL Energy Plus, LLC
and PPL Energy Corporation (collectively

"PPL") based on the filed rate doctrine. We will affirm the District Court's order.

## I.

### A. The Regulatory Scheme

The factual underpinnings of this suit involve the wholesale and retail electrical energy markets in Pennsylvania. The wholesale market for electrical energy is regulated by the Federal Energy Regulatory Commission ("FERC"). *See* Federal Power Act, 16 U.S.C. §§ 791a-828c. One of FERC's duties is to set "'just and reasonable'" wholesale electric rates. *See* 16 U.S.C. §§ 824d, 824e. During the period relevant to this appeal, FERC utilized a market-based rate to determine the cost of wholesale electricity. Under this scheme, any retail supplier of electricity in Pennsylvania had to have sufficient capacity[1] to provide one day's worth of the electrical energy to those customers the retail supplier had contracted to serve.

A retail supplier could satisfy its capacity obligations in one of two ways. It could cover its retail contractual obligation by having the ability to generate its own electrical energy. Alternatively, it could purchase capacity credits from other entities. If the retail supplier chose to purchase energy to satisfy its capacity obligations, it again had two general choices. It could enter into a bilateral

---

[1] Capacity refers to the retail supplier's ability to generate electrical energy.

contract with an entity that could supply it with capacity, or it could purchase its needed capacity in an auction market. Both the contractual and auction market options were regulated by FERC and authorized by PJM Interconnection, the FERC-established regional wholesale electricity market that coordinated the buying, selling and delivery of wholesale electricity.

In the PJM daily auction market, which is the market relevant to this appeal, entities with excess capacity were able to sell capacity credits to retail suppliers seeking to meet their daily obligations. Those sellers offered their excess capacity at a price they set – a "sell offer." The retail suppliers purchasing capacity credits made an offer to purchase capacity by placing a bid called a "buy bid." Once all the sell offers and buy bids were placed, PJM set the market-clearing price by ranking all sell offers and buy bids and determining at what price the next sell offer is equal to or less than the next buy bid. Once the market-clearing price was set, sellers who offered energy at or below that price received the market-clearing price and buyers who bid at or above that price paid it to obtain the capacity they need.

A regulatory penalty for failing to meet capacity obligations added an additional dimension to this auction mechanism. If a retail supplier of electricity failed to meet its capacity obligations for a given day, it then had to pay a penalty (the "capacity deficiency rate" or "CDR"). During the time period

relevant to this appeal, the FERC-approved CDR was $177.30/MW-day. This penalty was doubled on days when there was an overall shortage of available capacity.

The revenue from the CDR was given by PJM to entities that had unused excess capacity and had made that capacity available to the PJM. Thus, in essence, the penalty system forced deficient retail suppliers of electricity to purchase their needed capacity from entities with available excess capacity at the CDR.

**B. Utilimax and PPL's roles in the electrical energy market and the complained of conduct**.

Utilimax was a retail supplier of electricity that was licensed to purchase electrical energy in the wholesale market and resell that energy to end-users of electricity in Pennsylvania. Utilimax was not capable of generating its own electricity and, therefore, had to purchase sufficient capacity to meet its capacity obligations. During the relevant period of time, it used the PJM daily auction market as its primary method for satisfying its capacity obligations.

PPL is both a retail supplier of electricity and a seller of electricity in the wholesale market. According to Utilimax's complaint, during the first quarter of 2001 PPL was the only entity that had excess capacity available that Utilimax could purchase to satisfy its capacity obligations. Thus, under the regulatory system described above, PPL was able to ensure that it received the

CDR for its excess energy either by offering it for sale in the daily auction market at the CDR price or by simply collecting CDR revenues from any retail supplier that failed to meet its capacity obligations. According to Utilimax, PPL engaged in these practices during the first quarter of 2001. As a result of this conduct, CDR revenues during that quarter were $11,767,541, compared to CDR revenues of $1,000 or less during the fourth quarter of 2000. PPL received almost all of the CDR revenues for the first quarter of 2001.

Utilimax claims that PPL's actions violated § 2 of the Sherman Act, §§ 1 and 3 of the Clayton Act and various Pennsylvania state laws. The District Court dismissed Utilimax's complaint because it found that the filed rate doctrine barred the claims.

II.

We have jurisdiction over this appeal under 28 U.S.C. § 1291 and exercise *de novo* review over the District Court's decision to dismiss Utilimax's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Mariana v. Fisher*, 338 F.3d 189, 195 (3d Cir. 2003).

The filed rate doctrine, and its exceptions, are central to this appeal. That doctrine bars antitrust suits based on rates that have been filed and approved by federal agencies. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1157-58 (3d Cir. 1993); *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 162-63 (1922). The doctrine operates to bar both

federal antitrust actions and state law claims. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 580 (1981). Under the filed rate doctrine, a plaintiff may not sue the supplier of electricity based on rates that, though alleged to be the result of anticompetitive conduct, were filed with the federal agency responsible for overseeing such rates. *See Montana-Dakota Utils. Co. v. N. W. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951).

Utilimax is claiming that PPL exerted undue market influence over the wholesale capacity market and, as a result, was able to charge excessive rates for its capacity. Those rates, though allegedly excessive, were the result of PPL's temporary monopolistic position in the wholesale capacity market that was established and approved by FERC and PJM. Other than a brief and unconvincing argument that PPL violated the "sound utility practices" and "good faith" requirements of PJM, Utilimax makes no claim that PPL charged rates that were not in conformity with the requirements of the FERC and PJM-approved market model. Thus, absent an exception, the filed rate doctrine precludes Utilimax's claims against PPL.

Utilimax argues the District Court erred in not accepting either of the two pertinent exceptions to the doctrine – the competitor and the non-rate anticompetitive activity exceptions.

In *Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.*, we explained that a competitor exception to the filed rate doctrine exists because "competitors are not the intended beneficiaries of that rule of public utility regulation." 610 F.2d 1114, 1121 (3d Cir. 1979). Based on this reason, we refused to apply the filed rate doctrine to bar the suit of a communications company's competitor based on the company's actions in formulating a tariff and in customer service. *Id.* at 1122. Similarly, in *Lower Lake Erie*, we held that the railroads' competitors were not precluded by the filed rate doctrine from suing the railroads for their antitrust activities. *Lower Lake Erie*, 998 F.2d at 1161.

Utilimax claims that because it competes with PPL in the retail energy supply market, it is a competitor and, therefore, the filed rate doctrine does not prevent its antitrust claims. PPL argues that while Utilimax is a competitor of PPL in the retail electrical energy market, it is a customer in the wholesale market and it is PPL's actions in the wholesale market that Utilimax is alleging were anticompetitive. Thus, we must determine whether Utilimax is suing as a competitor of PPL or as a customer.

We are not the first court to have to parse the capacity in which a plaintiff was suing. In *Georgia v. Pennsylvania R.R. Co.*, the State of Georgia sued the defendant railroads for what it alleged to be a conspiracy to fix their rates "so as to prefer the ports of other States over the ports of Georgia." 324 U.S. 439, 443 (1945). Georgia sued the railroads in two relevant capacities: In its *parens patriae*

capacity on behalf of its residents and as the owner of a competing railroad company. *Id.* The Supreme Court determined that Georgia's real claims were in its *parens patriae* capacity, and its claim as a competitor was merely a "makeweight." *Id.* at 450. Having so concluded, the Court went on to hold that in its *parens patriae* capacity Georgia was suing on behalf of Georgia citizens who were customers of the railroad. Therefore, based on the filed rate doctrine, it could not maintain its antitrust claims to the extent they were seeking damages based on the defendant railroads' alleged conspiracy to fix rates. *Id.* at 453 (relying on *Keogh*, 260 U.S. at 161-63).

The Supreme Court in *Georgia* had the benefit of the plaintiff expressly stating the two different capacities in which it was suing. Here, Utilimax argues that it is suing only as a competitor, not as a customer. Its complaint, however, belies this argument. In describing the conduct of PPL that Utilimax claims violated the Sherman Act, the Clayton Act and various state laws, Utilimax alleges that PPL exercised undue market power over the wholesale electricity market and, as a result

> 65. Utilimax was effectively put out of business, as it could not operate under the burden of the artificially inflated capacity prices . . .

> 66. Utilimax and many other [retail suppliers of electricity] simply were

crushed and eviscerated by the artificially inflated prices set by PPL.

J.A. at 47.

The only fair reading of these allegations is that Utilimax, as a customer in the wholesale electricity market, could not afford to pay the rates that PPL was able to charge because of its allegedly anticompetitive conduct. The result of Utilimax's inability to buy capacity offered by PPL in the wholesale market was that it went out of business in the retail market and PPL had one fewer competitor in that latter market. That result, however, came about because Utilimax (as a customer of PPL) could not afford to buy capacity. While the ramifications were felt in its competitor role, the damage to Utilimax occurred because of its status as a customer of PPL. As Utilimax states in its complaint, "[Utilimax] was required to cover its capacity requirements per PJM rules and was compelled **to buy capacity delivered by PPL under these anticompetitive conditions**." J.A. at 48 (emphasis added).

It hardly needs stating that when an entity buys something from another entity there is a customer/seller relationship for that transaction, even if the two entities are competitors under other circumstances. *See, e.g.*, *Montana-Dakota Utils.*, 341 U.S. at 251-52 (applying the substance of the filed rate doctrine, without calling it such, to a suit where the plaintiff, who was a competitor of the defendant in the electric utility business, was suing based on rates it

5

negotiated with the defendant to purchase electric energy and those rates were filed with and accepted by FERC's predecessor commission). Based on Utilimax's allegations, it is clear that although it may have been a competitor with PPL in one market, it was a customer in the wholesale market. And it is PPL's actions in that latter market that form the corpus of Utilimax's complaint. Therefore, Utilimax does not qualify as a competitor of PPL with respect to its claims, and the competitor exception to the filed rate doctrine does not apply.

Utilimax also argues that the filed rate doctrine should not apply because its claims allege non-rate anticompetitive activity on the part of PPL. In *Lower Lake Erie*, several groups of plaintiffs sued various railroad companies alleging that those companies engaged in activities designed to prevent a new technology from entering the iron ore transportation market. 988 F.2d at 1154. According to the plaintiffs, this new technology would have allowed lower cost, non-railroad owned docks to enter the market for transporting iron ore from the shores of Lake Erie to inland sites. *Id.* We held that even those plaintiffs who were customers of the railroads, and who did not therefore qualify for the competitor exception to the filed rate doctrine, could maintain their suit against the railroads because their claims rested on non-rate anticompetitive activity. *Id.* at 1161.

Whereas *Lower Lake Erie* dealt with the defendant railroads' activities related to a technological innovation wholly separate from rates, here Utilimax alleges that PPL simply positioned itself in the wholesale capacity market to be able to charge exorbitant rates for capacity. Utilimax does not allege any non-rate anticompetitive activity, but simply claims that PPL exploited its market position by raising its rates. Therefore, Utilimax's claims are not saved from the filed rate doctrine by the non-rate anticompetitive activity exception.

III.

For the foregoing reasons, we will affirm the District Court's order.

6