Dawn A. McCRAY, et al.,

v.

FIDELITY NATIONAL TITLE INSURANCE COMPANY, et al.

Civil Action No. 08–775.

United States District Court, D. Delaware.

July 15, 2009.

---

John S. Spadaro, John Sheehan Spadaro, LLC, Hockessin, DE, for Dawn A. McCray, et al.

David A. Felice, Ballard, Spahr, Andrews & Ingersoll, LLP, Titania Mack Parker, Greenberg Traurig, LLP, Basil C. Kollias, Cooch & Taylor, John D. Balaguer, White & Williams, James Darlington Taylor, Jr., Saul Ewing LLP, Peter J. Duhig, Buchanan Ingersoll & Rooney P.C., Wilmington, DE, for Fidelity National Title Insurance Company, et al.

## MEMORANDUM

DALZELL, District Judge.[1]

In this putative class action, plaintiffs allege that the twenty defendants conspired with one another to fix the price of title insurance in Delaware. Those defendants include (1) the defendant rating bureau, Delaware Title Insurance Rating Bureau, (2) the corporate parent defendants, Fidelity National Financial, Inc., First American Corporation, Stewart Information Services Corporation, Old Republic International Corporation, and the Lan-

---

1. Sitting by designation pursuant to 28 U.S.C. § 292(b).

dAmerica Financial Group, and (3) the remaining fourteen defendants—the title insurer defendants—most of whom being subsidiaries of the corporate parent defendants.

The defendants filed a joint motion to dismiss pursuant Fed.R.Civ.P. 12(b)(6).[2] We shall grant this motion for the reasons explained below.

## I. *Factual Background*

In Delaware, the Department of Insurance ("DOI") regulates title insurance[3]. 18 Del. C. § 2502 (West 2009). Title insurers are required to file their rates with the DOI. *Id.* § 2504(a). Delaware is a "file and use" state, *i.e.*, the insurers file their rates with the DOI and begin to charge them after the effective date stated in their filings, unless the Commissioner disapproves the rates. Compl. ¶ 4; 18 Del. C. § 2506(a) ("[Rate] filings shall be deemed to meet the requirements of this chapter unless disapproved by the Commissioner"); *Elliott v. Blue Cross & Blue Shield of Delaware, Inc.*, 463 A.2d 273, 274 (Del.1983).

Delaware law permits insurers to comply with the rate filing requirements through membership in a licensed rating bureau. 18 Del. C. §§ 2510–12. The title insurer defendants here are all members of defendant Delaware Title Insurance Rating Bureau ("DTIRB"). Compl. ¶¶ 3, 31. DTIRB is a licensed rating bureau that "obtains, compiles, and analyzes statistical data from its members relating to their title insurance premiums, losses and expenses." *Id.* ¶ 19. The Delaware legislature placed title insurance under the authority of the DOI in 2002. 73 Del. Laws, c. 402 (2002). Since then, DTIRB has made only one rate filing, which had an effective date of February 1, 2004. Compl. ¶ 55, Ex. A.

The DOI obliges all rating bureaus to file "advisory prospective loss costs and supporting actuarial and statistical data" rather than simply filing advisory, final rates. Delaware Department of Insurance, Forms and Rates Bulletin No. 5, Lost Cost Filing Requirements (Nov. 27, 1995) ("Bulletin No. 5")[4]. The DOI mandated that "[e]ach insurer must individually determine and file the rates it will use as a result of its own independent company decision-making process. Advisory/rating organizations will continue to develop and file rules, relativity, and supplementary rating information on behalf of their participating insurers." *Id.* This regulation requires that each member of a rating bureau file its own rates, but allows the members' rate filings, as a predicate to their individual rates, to reference rating information that the rating bureau has filed with the DOI.

On November 13, 2003, before the first DTIRB filing went into effect, the DOI Commissioner, at DTIRB's request, exempted DTIRB members from filing rates in accordance with Bulletin No. 5, specifically the requirement to file loss cost data, because "there [was] no credible historic data, particularly with regard to expenses,

---

2. The joint motion does not include LandAmerica Financial Group, Inc., which has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

3. Title insurance is coverage that mortgage lenders oblige real property purchasers to buy before issuing a mortgage. Compl. ¶ 35. The insurance only covers defects in the title unknown at the time the policy is issued, and

the price of the policy is usually based on the property's cost. *Id.* ¶¶ 36, 42.

4. We take judicial notice of Bulletin No. 5, and the other Bulletin referred to herein, because the plaintiffs' complaint references them and they are public records of a state administrative agency. *Anspach ex rel. Anspach v. City of Philadelphia*, 503 F.3d 256, 273 n. 11 (3d Cir.2007).

that the rating bureau could use in preparing the initial rates."[5] Delaware Department of Insurance, Forms and Rates Bulletin No. 27, Title Insurance Filing Requirements (Nov. 13, 2003) ("Bulletin No. 27"). Although the Commissioner exempted DTIRB members from certain Bulletin No. 5 filing requirements, she ordered that by February 1, 2004, DTIRB "must have an approved statistical plan in place, [which would] allow for collection and aggregation of sufficient premium, loss and expense data to enable the [DOI] to monitor rate adequacy." *Id.*

The plaintiffs allege that the title insurer defendants used DTIRB as a mechanism to set uniform rates, and, at the behest of the title insurer defendants, DTIRB improperly included in its rate calculation the cost of "kickbacks in the form of finder's fees, gifts, and other financial enticements." Compl. ¶¶ 31, 43. The plaintiffs aver that the title insurance industry is highly concentrated and noncompetitive (defendants account for 98% of the premiums paid in Delaware), and despite growing efficiencies and profit margins, the rates have not changed since 2004. *Id.* ¶¶ 54–57. In contrast with property and casualty insurance, these defendants do not market insurance to ultimate purchasers, and plaintiffs claim that this is further

evidence of an agreement not to compete. *Id.* ¶ 58.

## II. *Analysis*[6]

As noted, plaintiffs allege that, through DTIRB, the defendants entered into an agreement to fix title insurance prices in Delaware, which is *per se* illegal price-fixing. Plaintiffs assert an antitrust claim under the Sherman Act, 15 U.S.C. § 1, and a state law unjust enrichment claim. Compl. ¶¶ 70–78. The defendants contend that we should dismiss the plaintiffs' complaint because the filed rate doctrine, also known as the filed tariff doctrine, bars these claims. Defendants also argue that the plaintiffs have failed to allege sufficient facts to establish that the corporate parents of the Delaware title insurer defendants entered into a conspiracy with their subsidiaries to fix title insurance prices.

We first consider the issues related to the filed rate doctrine before turning to the sufficiency of the allegations against the corporate parent defendants.

### A. *The Filed Rate Doctrine*

The filed rate doctrine goes back at least as far as *Texas & Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), but it was Justice Brandeis in *Keogh v. Chicago & Nw. Ry.*

5. DTIRB's request was made pursuant to 18 Del. C. § 2505, which provides that "the Commissioner may, by written order, suspend or modify the requirement of filing as to any kind of insurance, subdivision or combination thereof, or as to classes of risks, the rates for which cannot practicably be filed before they are used."

6. In reviewing a motion to dismiss for failure to state a claim, "[w]e accept all well pleaded factual allegations as true and draw all reasonable inferences from such allegations in favor of the complainant." *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003).

To survive a motion to dismiss, the plaintiff must "allege facts sufficient to raise a right to relief above the speculative level." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir.2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S.Ct. at 1974. This requires "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Haspel v. State Farm Mut. Auto. Ins. Co.*, 241 Fed.Appx. 837, 839 (3d Cir.2007) (unpublished) (quoting *Twombly*, 127 S.Ct. at 1969).

*Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), who gave the doctrine explicit foundation in his opinion for the Court. In *Keogh,* the doctrine precluded recovery of treble damages under the Sherman Act based on the unreasonableness or excessiveness of the rate that defendants submitted to the Interstate Commerce Commission ("ICC"), which had determined the rate submitted to be reasonable and lawful. *Id.* at 164, 43 S.Ct. 47. Since *Keogh,* the Supreme Court has expanded the doctrine beyond the ICC context and applied it to bar state law claims as well. *E.g., Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 580, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (dismissing state contract claim involving rates filed with FERC).

Over the years, the doctrine's acceptance had diminished to the point where Judge Henry J. Friendly suggested that the Supreme Court overrule *Keogh* because modern legal practice had obviated the need for such a doctrine. *Square D Company v. Niagara Frontier Tariff Bureau, Inc.,* 760 F.2d 1347, 1352–56 (2d Cir.1985). But the Supreme Court did not take Judge Friendly's suggestion, and instead reaffirmed—if tepidly—the vitality of the filed rate doctrine. *Square D Company v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 424, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).[7] Since this reaffirmation, courts have continued to apply the filed rate doctrine and have developed a host of exceptions and specific considerations that courts ought to address when applying it. *See, e.g., Utilimax.com, Inc. v. PPL Energy Plus, LLC,* 378 F.3d 303, 306–07 (3d Cir.2004) (discussing two exceptions to the filed rate doctrine, neither of which being relevant here).

The pertinent considerations about the filed rate doctrine lead us to conclude that it applies to the plaintiffs' federal and state claims for money damages. But the filed rate doctrine does not necessarily foreclose all avenues of injunctive relief the plaintiffs may be seeking. Therefore, for the reasons stated below, we will grant the defendants' motion to dismiss, but afford plaintiffs leave to amend their complaint to request injunctive relief that is consistent with the filed rate doctrine and to allege facts sufficient to state a conspiracy claim against the corporate parent defendants.

**1. *Applicability of the Filed Rate Doctrine to Delaware's Title Insurance Regulation Regime***

As a preliminary matter, our Court of Appeals has applied the filed rate doctrine to bar claims when the rates involved have been filed with a federal agency, but has yet to specifically rule on whether the doctrine applies to rates that state administrative agencies authorize. *Cf. Utilimax.com, Inc. v. PPL Energy Plus, LLC,* 378 F.3d 303, 306 (3d Cir.2004). Other courts have applied the doctrine to preclude recovery of money damages based on allegations that the rates filed with either state or federal agencies were inflated or improper. *See, e.g., Wegoland, Ltd. v. NYNEX Corp.,* 806 F.Supp. 1112, 1115–16 (S.D.N.Y.), *aff'd* 27 F.3d 17 (2d Cir. 1994) (dismissing civil RICO claim involving rate information filed with different state and federal agencies); *Taffet v. Southern Co.,* 967 F.2d 1483, 1494 (11th Cir.1992) (*en banc*) (dismissing civil RICO action involving rates filed with state utility regulators); *H.J., Inc. v. Nw. Bell Telephone Co.,* 954 F.2d 485, 494 (8th Cir.1992)

---

7. *Square D* involved an alleged horizontal price-fixing conspiracy perpetrated by the defendants through a nonprofit tariff bureau to which all of the defendants belonged, and through which the defendants made rate filings with the ICC. 476 U.S. 409, 411–12, 106 S.Ct. 1922. The Supreme Court held that the filed rate doctrine still precluded recovery of treble damages under the Sherman Act.

(dismissing claims by telephone users involving rates filed with state public utility commission).

■ We have found no instance of a court holding that the filed rate doctrine does not apply because a state agency, rather than a federal one, authorized the rates. Given the weight of authority in favor of applying the doctrine to state agency authorized rates, we will preclude the recovery of treble damages for a Sherman Act claim predicated on the alleged excessiveness or otherwise unreasonableness of a rate filed with a state administrative agency.

### 2. *Keogh as Antitrust Immunity*

Plaintiffs contend that *Keogh* and its progeny should only apply when "there is a clear repugnancy between the antitrust laws and the regulatory system." Pl.'s Resp. at 11 (citing *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966)). This "repugnancy" argument relies on a characterization of the filed rate doctrine as an immunity from antitrust liability, which we should not apply without evidence of legislative intent to create such an immunity. Pl.'s Resp. at 12 (citing *Kirkwood v. Union Electric Co.,* 671 F.2d 1173, 1178 (8th Cir.1982)).

But the Supreme Court addressed this very issue in *Square D.* It held that "collective ratemaking activities are not immunized from antitrust scrutiny simply because they occur in a regulated industry" and thus *Keogh* does *not* engraft an immunity from antitrust liability. *Square D,* 476 U.S. at 421–22, 106 S.Ct. 1922. Instead, *Keogh* holds that "an award of treble damages is not an available remedy," but regulated companies remain "subject to scrutiny under the antitrust laws by the

Government and to possible criminal sanctions or equitable relief." *Id.*

Were we to permit money damages based on the unreasonableness of the filed rate, and the plaintiffs were successful in their claims, we—or a jury—would be obliged to determine what the rate should have been, *i.e.,* to fix a "reasonable" rate different from the one the DOI thought "reasonable". As the Supreme Court has recognized,

> the problem is whether it is open to the courts to determine what the reasonable rates during the past should have been. The petitioner, in contending that they are so empowered, and the District Court, in undertaking to exercise that power, both regard reasonableness as a justiciable legal right rather than a criterion for administrative application in determining a lawful rate. Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the [regulatory body].

*Montana–Dakota Utilities Co. v. Nw. Public Service Co.,* 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

The district court in *Wegoland* usefully identified "two companion principles [that] lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that courts are not institutionally well suited to engage in retroactive rate-setting." 806 F.Supp. at 1115. The first principle is the "anti-discrimination strand and [the second is] the non-justiciability strand." *Id.* The Supreme Court's holding in *Square D* epitomizes the second of these strands because

it sought to avoid enmeshing courts in the rate setting process that legislatures specifically entrusted to expert administrative bodies. But, as noted, the Supreme Court did *not* eliminate antitrust liability but only excluded monetary relief that involved consideration of an alternative, reasonable rate from the available antitrust remedies.

■ Thus, the filed rate doctrine does not amount to antitrust immunity, and we shall apply the doctrine to the plaintiffs' claims unless some other consideration counsels otherwise.

### 3. *Adequacy of the Regulatory Regime*

The plaintiffs argue that we should not apply the filed rate doctrine because Delaware's regulatory regime is inadequate. They proffer two arguments: first, Delaware's regulatory regime does not provide for meaningful review of rates because it does not require express approval of rates; and, second, the Delaware regulatory regime is not comprehensive because it does not provide "full relief," *i.e.*, retrospective money damages. Pl.'s Resp. at 14–19.

#### i. *Meaningful Review*

Some courts have declined to apply the filed rate doctrine when the regulatory process does not require active approval of the filed rate, *i.e.*, where all that is required is passive non-disapproval of the filed rate. *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 393 (9th Cir.1992); *see also Wileman Bros. & Elliott v. Giannini*, 909 F.2d 332, 337–38 (9th Cir.1990). In *Brown*, the plaintiffs filed a class action suit alleging that the defendant had violated the antitrust laws by participating in state-licensed rating bureaus that filed rates with state administrative agencies. *Id.* at 388. The Ninth Circuit focused on the regulatory regime's only requiring non-disapproval of rates, rather than robust antecedent review and express approval of them. *Id.* at 394. *Brown* held that the filed rate doctrine did not apply

because the rates the defendant filed "were not subject to meaningful review by the state, [and thus] the fact that they were filed does not render them immune from challenge." *Id.* at 394.

Other than the Ninth Circuit in *Brown*, no other court has taken such a narrow view of the applicability of the filed rate doctrine. The Supreme Court in *Montana–Dakota* stated that the parties "can claim no rate as a legal right that is other than the filed rate, whether fixed *or merely accepted by* the [regulatory body]." 341 U.S. at 251, 71 S.Ct. 692 (emphasis added). The Eleventh Circuit in *Taffet* applied the filed rate doctrine after an exhaustive description of the regulatory regimes at issue, both of which were "file and use" regimes similar to Delaware's. *Taffet*, 967 F.2d at 1490. The district court in *Wegoland* suggested that the filed rate doctrine might apply even if there was no meaningful review of rates. *Wegoland*, 806 F.Supp. at 1120.

But the relevant statute in *Keogh* mandated only that the covered common carriers publish their rate increases with ten days' public notice before they went into effect. 24 Stat. 381 (49th Cong. Feb. 4, 1887). The statute empowered the ICC to investigate the common carriers, suspend any rate increases, and hold a hearing based on a filed complaint. *Id.* at 383–84. Much like the modern "file and use" system in Delaware and other jurisdictions throughout the United States, the statute in *Keogh* did not require express approval of the rate before it went into effect. The same is true of the successor statute in *Square D*, where Judge Friendly articulated the central question in that case as "whether [*Keogh* ] has been overruled so far as its language extends to rates *filed with but not investigated and approved by* the Interstate Commerce Commission." *Square D*, 760 F.2d at 1349.

Our Court of Appeals has not ruled on whether the filed rate doctrine applies only to those regulatory regimes that expressly approve rates, and we do not believe it would so hold. To engraft antecedent regulatory review as a condition precedent to the doctrine's vitality would jeopardize every "file and use" regulatory system, notwithstanding decades of practice since *Keogh* was decided.

■ Although some courts have suggested that meaningful review may not be a prerequisite for applying the filed rate doctrine, *Wegoland*, 806 F.Supp. at 1120, Delaware law and DOI regulation establish that title insurance rates are indeed subject to genuine review. Delaware law states that "[t]he Commissioner *shall* review filings as soon as reasonably possible after they have been made in order to determine whether they meet the requirements of this chapter." 18 Del. C. § 2506(a) (emphasis added). The Commissioner is obliged to consider various factors and evidence in determining whether the rate filed comports with the law and to ensure those rates are not "excessive, inadequate or unfairly discriminatory." *Id.* § 2503(a). The filing of regulated entities must include information sufficient to justify the rate and a proposed effective date. *Id.* § 2504(b). If such information is not included with the filing, Delaware law mandates that the Commissioner oblige the insurer to provide such information. *Id.* Although the DOI has no separate title insurance division or certified public accountant assigned to review such information, the DOI uses the services of an outside actuarial firm to review its rate filings, and this compensates for any internal lack of expertise. Compl. ¶ 49; Bulletin No. 27.

Delaware's regulatory regime thus amounts to meaningful and competent review of rate filings to determine whether rates comply with the statutory principles.

We therefore reject plaintiffs' contentions to the contrary.

### ii. *Comprehensiveness*

■ Plaintiffs also argue that we should not apply the filed rate doctrine because Delaware's regulatory regime is insufficiently comprehensive. They contend that the Delaware regime fails to provide individuals like the plaintiffs with monetary relief for rates the DOI accepted but that are later found to be unreasonable or predicated on fraud. Without this type of relief, plaintiffs complain that their claims fall into a regulatory lacuna, which counsels against applying the filed rate doctrine.

■ Plaintiffs primarily rely on "price squeeze" cases in support of their argument. *See, e.g., City of Kirkwood*, 671 F.2d at 1176; *City of Mishawaka v. Indiana & Michigan Elec. Co.*, 560 F.2d 1314, 1321 (7th Cir.1977). A "price squeeze" claim involves two rates, one wholesale and the other retail, each regulated by different regulatory rate-setting bodies. Such a claim alleges that the defendant manipulated the different rates, usually through the filing of wholesale rates, to extract a competitive advantage against customers at the wholesale level and competitors at the retail level. Such a "price squeeze" claim is *not* at issue here.

These "price squeeze" cases contain language that plaintiffs contend confirm the inappropriateness of applying the filed rate doctrine when "no single regulator has authority over all the various rates." Pl.'s Resp. at 18 (citing *City of Kirkwood*, 671 F.2d at 1178–79; *City of Mishawaka v. Amer. Elec. Power Co.*, 616 F.2d 976, 983 (7th Cir.1980)); *see also City of Mishawaka*, 560 F.2d at 1321. Courts in these instances refused to apply the filed rate doctrine because the claim "falls within a lacuna of state and federal regulation," *i.e.*, no single regulator was in a position to

remedy such manipulation because it involved a rate outside that regulator's control. *Borough of Lansdale v. PP & L, Inc.*, 503 F.Supp.2d 730, 736 (E.D.Pa.2007) (quoting 1A Areeda, Hovenkamp, & Elhauge, Antitrust Law ¶ 244e (2d ed. 2004) (internal quotations omitted)).

But that is not the problem here. The plaintiffs' claim falls into *no* regulatory lacuna. There is but one regulatory authority here, the Delaware Department of Insurance, and it is fully empowered to regulate the one rate at issue here that involves title insurance premiums. *See Levinson v. Delaware Compensation Rating Bureau, Inc.*, 616 A.2d 1182, 1188 (Del. 1992) ("the Commissioner has sole original jurisdiction to determine rates"). Thus, the "price squeeze" cases are beside the point.

To be sure, the application of the filed rate doctrine is indeed predicated on the existence of a comprehensive regulatory regime that affords sufficient relief to individuals like the plaintiffs. *See Taffet*, 967 F.2d at 1490–94. But in *Taffet*, the Eleventh Circuit examined the "file and use" electrical power rate-setting regimes in Georgia and Alabama, and found them comprehensive. Both regimes permitted the rate-setting bodies to investigate the reasonableness of rates upon complaint. *Id.* at 1490, 1491. Both provided for administrative hearings to challenge the reasonableness of the rates. *Id.* Both provided review of administrative decisions by the state courts but did not let courts substitute their judgment about the reasonableness of the rates if *some* evidence justified the rate set. *Id.* Both regimes empowered the rate-setting bodies to suspend or disapprove a rate at any time as long as certain procedures were followed. *Id.* Neither system provided for money damages for rates later found to be unreasonable, but permitted the rate-setting bodies to consider the previous unreason-

ableness when setting prospective rates. *Id.* at 1492–93.

Delaware's insurance regulation regime is much the same as those considered in *Taffet*. Any individual or organization that in good faith is "aggrieved with respect to any filing which is in effect" can make a written complaint to the Commissioner, who then must hold a hearing with notice to all potentially affected parties. 18 Del. C. § 2520. If, after the hearing, the Commissioner determines that the rate in question does not comply with the law, then he or she may issue an order specifying the nature of the noncompliance and the date the rate will expire. *Id.* Judicial review is available in the Delaware Chancery Court to "any person aggrieved" by "[a]ny order, decision or act of the Commissioner," but that review is limited to "review for error of law or lack of substantial evidence." *Id.* § 2531; *Levinson*, 616 A.2d at 1191. The Commissioner can direct an insurer to change its proposed rates to comply with the statutory scheme. *See Blue Cross and Blue Shield v. Elliott*, 1977 WL 23810, at *1 (Del.Ch. April 13, 1977) (Commissioner "directed Blue Cross and Blue Shield to reduce proposed weighted average rate increases from an overall average of 21.4% to 12.15%"). Like the regulatory schemes considered in *Taffet*, the Commissioner's determination is prospective and does not "affect any contract or policy made or issued prior to the expiration of the period set forth in the order." *Matter of Surcharge Classification 0133 By Del. Compensation Rating Bureau, Inc.*, 655 A.2d 295, 299–300 (Del.Super.), *aff'd* 655 A.2d 309 (Del.1995).

We can find nothing explicitly authorizing or preventing the Commissioner of DOI from considering past fraud of a regulated entity when determining a reasonable, prospective rate. From the lack of any legal restriction on the rate-setting

bodies to consider past behavior, *Taffet* inferred that the rate-setting bodies had the power to consider past fraudulent rate filings when setting prospective rates. 967 F.2d at 1493 ("As in Alabama law, nothing in Georgia law forbids the [regulatory body] from setting prospective rates that are low enough to compensate consumers for excesses paid in the past because a [regulated entity] defrauded [the regulated body]"). Here, Delaware law seeks "to promote the public welfare by regulating insurance rates" and establish insurance rates that are not "excessive, inadequate or unfairly discriminatory." 18 Del. C. § 2501. To that end, the Commissioner is obliged to give due consideration to "past and prospective loss experience within and outside this State" and "all other relevant factors within and outside this State." *Id.* § 2503.

We see no obstacle in Delaware law that would prevent one from filing a complaint with the Commissioner and seeking prospective redress in the form of lower rates to compensate for filed rates that are later shown to have been excessive. Thus, we find Delaware's regulatory regime, like those in *Taffet*, to be comprehensive for the purposes of applying the filed rate doctrine.

### 4. *Compliance with Filing Requirements and Fraud in the Rate–Making Process*

■ Lastly, plaintiffs argue that the filed rate doctrine should not apply because the defendants did not properly file their rate. Plaintiffs have alleged that the defendants' filings included the cost of "kickbacks and other agency commission payments" as part of the filed rate, and failed to include cost data on agency commissions, thereby making their filing both fraudulent and procedurally noncompliant. Compl. ¶¶ 47, 49. Our Court of Appeals has held that there is no fraud-in-the-rate-setting exception to the filed rate doctrine.

*AT & T Corp. v. JMC Telecom, LLC,* 470 F.3d 525, 535 (3d Cir.2006). Therefore, we will concentrate exclusively on the plaintiffs' assertion that the defendants' filing with the DOI was procedurally noncompliant.

■ A regulated entity's procedural non-compliance with regulatory orders can make that entity liable for money damages despite the filed rate doctrine. *Security Services, Inc. v. K Mart Corp.,* 511 U.S. 431, 442, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994); *see also TON Services, Inc. v. Qwest Corp.,* 493 F.3d 1225, 1237 (10th Cir.2007).

In *Security Services,* the defendant motor carrier had filed a rate with the ICC, which received and accepted it. *Id.* at 433, 114 S.Ct. 1702. But the application made reference to, and relied on, a mileage guide filed by a rating agency to which the defendant belonged. *Id.* This mileage guide made reference to yet other rating agency filings. *Id.* Pursuant to ICC regulation, such guides and supplemental materials only applied to those who were participants in the rating agency. *Id.* at 436–37, 114 S.Ct. 1702. After the defendant had filed its rate with the ICC, the rating agency cancelled the defendant's participation in the rating agency for failure to pay the requisite fee. *Id.* at 434, 114 S.Ct. 1702.

■ The Supreme Court held that from the moment the cancellation of participation became effective, the defendant's filed rate (and thus the filed rate doctrine) no longer applied because the application became incomplete on its face, *i.e.,* the defendant could no longer rely on the mileage guide and the supplemental materials, both of which were necessary to make the application complete. *Id.* at 441–42, 114 S.Ct. 1702. Failure to comply with regulatory procedural requirements will make a filed rate invalid, and once the filed rate

ceases to apply, so does the filed rate doctrine.

In *TON Services*, the Tenth Circuit held that the filed rate doctrine did not apply because of a more complex failure to comply with regulatory procedure. There, Congress had directed the Federal Communications Commission to ensure that the intrastate rate that telecommunications service providers charged for payphones could not favor payphone service providers owned by the rate-chargers. *TON*, 493 F.3d at 1229. The FCC then ordered the telecommunications service providers to file cost-based rates, accompanied by cost data, with the appropriate state regulatory body. *Id.* at 1230.

On April 10, 1997, five days before this FCC order went into effect, a coalition of telecommunications service providers petitioned the FCC to delay the effective date because they were not prepared to file cost-based rates and the necessary data. *Id.* at 1231. The FCC granted the coalition's request, but ordered the telecommunications service providers to reimburse or credit any payphone service providers not owned by the rate-charger for the difference between the non-compliant rate and the subsequently filed, complaint rate (if the latter rate was lower than the former rate) for the period from April 15, 1997 to when the rate-charger became fully compliant with the FCC's order to file cost-based rates. *Id.* at 1232.

From April of 1997 to April of 2002, the defendant in *TON* had not filed either a rate or the required cost-data as the FCC ordered. *Id.* at 1234. In 2002, the defendant filed new rates and cost-data that were lower than those it was charging since April of 1997. *Id.* The plaintiff sought to recover the difference between the two rates for the period from April 15, 1997 and the day the later rate would go into effect. *Id.* The defendant argued that the filed rate doctrine prevented recovery

of money damages because the defendant had filed its previous rates with the appropriate regulatory body. The Tenth Circuit held that the filed rate doctrine did not apply because plaintiff sought to enforce existing regulatory orders that made damages available to those in the plaintiff's position.

In *Security Services* and *TON*, the filed rate doctrine did not apply when the defendant failed to comply with regulatory procedure or the plaintiff sought to enforce regulatory orders already in place. In the first instance, an invalid rate application takes the regulated entity outside the purview of the regulatory body, and, in the second, regulatory orders signal that the relevant regulatory body authorizes damages and specifies how they would be calculated. In either case, the lack of compliance with regulatory procedure eliminates the usual justiciability concerns that underpin the filed rate doctrine.

Here, the plaintiffs do not allege regulatory noncompliance. They contend that the defendants did not file any of the cost data that DOI's loss cost regulations required. Compl. ¶¶ 47, 49; Bulletin No. 5. But the Commissioner specifically waived the loss cost requirements in Bulletin No. 27, and required DTIRB to have a statistical plan in place to collect that data. When the defendants filed their rates, they were not required to include the loss cost data and, thus, did not fail to comply with the regulatory filing requirements.

In short, the plaintiffs have not alleged that the defendants have failed to comply with the regulatory procedures in any other way. Thus, their procedural noncompliance argument fails.

### 5. *Injunctive Relief*

Both the Supreme Court and the Second Circuit in *Square D* suggested that equitable relief under the Sherman Act may continue to be viable after a court applies the filed rate doctrine. *Square D*, 476

U.S. at 422 n. 28, 106 S.Ct. 1922 (noting that the possible existence of injunctive relief was one of the reasons that the filed rate doctrine did not amount to antitrust immunity); *Square D*, 760 F.2d at 1364–66 (remanding to district court to consider the possibility of injunctive relief).

But courts have held that the filed rate doctrine precludes injunctive relief when the injunctive relief seeks to prevent the defendants from relying on the filed rate. *See, e.g., Burlington Northern, Inc. v. United States*, 459 U.S. 131, 138–142, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982) (vacating injunction that ordered a reduction in rates); *Utility Dist. 1 v. Dynegy Power Marketing, Inc.*, 384 F.3d 756, 761–62 (9th Cir.2004) (denying injunction that would have prevented defendants from using market dependent but filed rates); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419–20 (1st Cir.2000) (denying injunction that would in effect block application of the rate charge at issue); *Utility Choice, L.P. v. TXU Corp.*, 2005 WL 3307524, at *5–6 (S.D.Tex. Dec. 6, 2005) ("Plaintiffs' request for equitable relief cannot be separated from acts affecting the rates Defendants' charge"); *In re California Wholesale Elec. Antitrust Litig.*, 244 F.Supp.2d 1072, 1078 (S.D.Cal. 2003) (injunction denied because it sought to block the application of filed rates). Thus, the filed rate doctrine bars injunctive relief insofar as it is an attempt to avoid the effect of the doctrine, *i.e.*, an injunction that prevents the defendants from relying upon the filed rate.

Plaintiffs do not describe in much detail the type of injunctive relief they seek. They simply state that they wish to enjoin the conduct that stems from "the unlawful contract, combination and conspiracy alleged in [the Sherman Act claim]." Compl., Prayer ¶ b; *see also* Compl. ¶¶ 60–61, 72. As we have explained, we cannot grant injunctive relief that bars the defen-

dants from using the filed rate. This may not be the only type of relief that the plaintiffs seek, but we will not speculate on what they have in mind. Instead, we shall dismiss their claim for injunctive relief as it is currently articulated, but grant leave to plaintiffs to amend their complaint to request injunctive relief that does not run afoul of the filed rate doctrine as we have just construed it.

### B. *Sufficiency of Conspiracy Allegations Against Corporate Parent Defendants*

The defendants also move to dismiss the claims against the corporate parent defendants. They argue that the plaintiffs have failed to allege sufficient facts from which we can infer that the corporate parent defendants entered into the alleged conspiracy.

Generally, "a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Moreover, one cannot "allege a [Sherman Act] conspiracy between a parent corporation and its subsidiary, because an agreement under the Sherman Act must be between separate, independent entities capable of combining their efforts to restrain trade." *In Re California Title Ins. Antitrust Litig.*, 2009 WL 1458025, at *7 (N.D.Cal. May 21, 2009) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). Thus, for the plaintiffs to aver sufficient facts to state a claim against a parent corporation they must aver facts sufficient to infer either direct involvement or some reason to pierce the corporate veil.

Here, the plaintiffs allege that the corporate parent defendants controlled their respective subsidiaries, and these subsidiaries colluded to fix title insurance prices in Delaware. Compl. ¶¶ 21, 23, 25, 27, 29,

31. Plaintiffs maintain that they have adequately alleged that the corporate parent defendants conspired with one another to fix these prices, and their subsidiaries are merely a mechanism to provide title insurance in Delaware. Pl.'s Resp. at 25.

But that is not what they have alleged in their complaint. Plaintiffs allege that the defendants used DTIRB to fix rates. Compl. ¶¶ 1–8. The only defendants who are members of DTIRB are the title insurer defendants. Compl. Ex. A. Without some averment that the corporate parent defendants directly entered into agreements, or the title insurer defendants are the corporate parent defendants' alter egos, the plaintiffs have not alleged enough to establish that the corporate parent defendants entered into a conspiracy to fix title insurance prices in Delaware. We shall, therefore, dismiss the claims against the corporate parent defendants, but grant plaintiffs leave to amend their complaint to aver sufficient facts to state a claim against these defendants if they can do so conformably with Fed.R.Civ.P. 11 and the *Copperweld* jurisprudence.